BAY STATE OPTICAL CO. v. KLEIN et al.

District Court, E. D. New York. March 2, 1927.

No. 2098.

1. Patents ⬡328—1,472,014, for temple bar construction, held not infringed.

Clulee patent, No. 1,472,014, for temple bar construction for spectacles, as limited by the prior art, assuming validity after filing of a disclaimer, *held* not infringed.

2. Patents ⬡155—Disclaimer to cure possible ambiguity in claims is not admission of invalidity without it.

Disclaimer may be filed to cure possible ambiguity in claims and is not admission of invalidity without it.

3. Patents ⬡328—1,527,118, for eyeglass construction, held not infringed.

Clulee patent, No. 1,527,118, for eyeglass construction, *held* not infringed.

In Equity. Suit by the Bay State Optical Company against Morris Klein, Isidore Klein, and Louis Dunklesberg, individually and as partners as the Newport Optical Manufacturing Company, and the Newport Optical Manufacturing Company, Inc. Decree for defendants.

Robert S. Blair, William T. Knieszner, and Rufus B. Short, all of New York City, for plaintiff.

Thomas Howe, of New York City (Lyman E. Dodge, of New York City, of counsel), for defendants.

CAMPBELL, District Judge. This is a suit in equity, brought by the Bay State Optical Company against Morris Klein, Isidore Klein, and Louis Dunklesberg, individually and as copartners doing business under the name of the Newport Optical Manufacturing Company, and the Newport Optical Manufacturing Company, Inc., which is the successor of the said copartnership, for an injunction and accounting for the alleged infringement of letters patent No. 1,472,014, issued to Stephen J. Clulee, for temple bar construction, dated October 23, 1923, and letters patent No. 1,527,118, issued to Stephen J. Clulee, assignor to Bay State Optical Company, for eyeglass construction, dated February 17, 1925. The defendants

have interposed the defenses of invalidity and noninfringement.

The patents in suit relate to the construction of spectacle temple bars, or "temples," as they are commonly called, which are manufactured and sold in quantities, to be affixed to various types of "fronts" to form complete "frames." For convenience I will consider the patents in the order of their issue.

Patent No. 1,472,014.

[1] The temple bar described in the patent in suit comprises the following parts: The main body portion of celluloid, that term being used in a broad sense to comprehend various nonmetallic substances of substantially similar nature, adapted to form eyeglass frames and associated parts; within the rear end of such main body portion a longitudinal centrally positioned recess is formed by drilling or in any suitable manner; the ear loop, comprising the metallic portion, preferably taking the form of a spirally wound wire member, the end portion of which is inserted in the recess in the main body portion with a twisting movement, in such manner as to cause the spirally wound metallic portion to be more tightly wound as it is forced into the recess. Having inserted it to the required degree, the twisting motion is discontinued, and this permits the spirally wound member to expand and make certain the interlocking of the end portion thereof with the walls of the main body portion.

This metallic portion is curved or bent to conform substantially to the contour of the back of the ear. On the core thus formed a celluloid strip, after being softened to a suitable degree, as by immersion in a suitable solvent, is wound spirally, and the rear end portion of the main body portion having been gradually tapered from a shoulder which had been formed thereon to the extreme end of the main body portion, so that it is substantially of the diameter of the metallic extension, the winding of the celluloid ribbon is continued on the main body portion to the hump formed thereon, and by working or cementing the celluloid thus wound and the face of the hump of the main body portion the celluloid is caused to flow or merge. Preferably the celluloid ribbon portion, after being softened as above described, is wound on a mandrel and slipped over the ear loop.

The celluloid strip or ribbon is described in the patent in suit as "preferably having a cross-section determined substantially by a straight line to form a substantially flat face

*16a* therefor and by a curved line to form an opposite curved face *16b* therefor," and the effect of this construction, as described in the patent in suit is: "The curved inner faces of the convolutions of the ribbon *16* permit the ready flexing of the ribbon *16* with the flexible core *15* without disturbing the alignment on the exterior of the outer flat faces *16a* of the consecutive convolutions." At the extreme end of the ear loop is cemented a celluloid cap.

The patent contains some variations of construction in its several figures, but in substance they are the same. This patent has 14 claims, and all but claim 14 are in suit. Claim 1 reads as follows:

"1. In eyeglass construction, a temple bar having a main body portion of celluloid, a coiled metallic extension secured thereto and extending rearwardly thereof, and a coiled celluloid extension surrounding said coiled metallic extension."

Claim 2 defines the end of the metallic core as entering into the main body portion. Claim 5 brings in the abutment at the extreme end and the various relative diameters of parts.

Claim 11 sets forth that the metallic extension shall interlock with the wall of the recess in the body portion. Claim 12 defines the zylonite coil as secured to the extreme outer end of the metallic core member.

One object of the invention as described by the patentee in the specification is "to provide a nonmetallic temple bar for holding the eyeglasses or eyeglass frame in proper position with respect to the eyes that will be of simple and practical construction, yet durable and rugged, to meet the conditions of practical use."

This it seems to me was the main object, because the holding of the glasses in proper position with respect to the eyes is of the utmost importance, as is also the fact that the temples must be durable and rugged, because of the way in which they are generally handled in putting on or removing the same.

The art is a crowded one and there is not much room for anything but improvements. Defendants have offered in evidence 27 United States and one British patent, together with some alleged prior uses, but it is not necessary to analyze each of them.

The Stern temple, alleged to be a prior use, has a straight part that is almost entirely of metal, and an inner coiled member, but has no outer coil of zylonite. It is made by dipping it in zylonite of about the thickness of thin molasses. These temples could not be made a commercial success, because the coating would crack if they were bent, and catch the hair, and the fluid of zylonite, when applied, would cement the coils of the metal cable into a compact mass. No claim of the patent in suit, even in terms, is met by the Stern temple, and it is in no sense the same as the patent in suit.

The Veltex temple is set forth in the United States patent, No. 1,293,215, to Scarles. It comprises a solid metal wire of uniform diameter from end to end, in which a shoulder is formed, which shoulder is notched to form an annular groove or chamber surrounding the main or body portion of the temple wire, into which the inner front end portion of the spirally coiled nonmetallic covering is inserted, and the edge portions of the metal wall surrounding said chamber are compressed and swaged down upon the end portion of the nonmetallic covering within said chamber and the rear end of the tip of the temple. Another one of these hollow metal cups was squeezed down onto the end of the zylonite cable into which the nonmetallic covering was inserted and the edges of the cup compressed or swaged. Only the ear portion of the temple is covered with a thin flat spirally wound strip of zylonite, and the purpose was to form a protection for the ear similar to a piece of small rubber that might have been slipped over the ear loop. The Veltex temple did not have a main body portion of celluloid, nor a coiled metal core, but it undoubtedly did have a spiral zylonite member.

The Poeton United States patent, No. 1,265,511, discloses a metal wire temple having at the ear loop a string of beads. The straight part of the temple is of the ordinary thin metal flattened for flexibility. The construction of the ear loop is described by the patentee in the specification as follows:

"In the general construction of my improved temple I prefer to have the members *5'* cylindrical in form as shown in Figs. VI and VII, and formed at one end with a substantial cup *6,* and at its opposite end with an oval shaped head *7* adapted to fit into the cup *6* and provide a loosely fitting joint, whereby the loop *4'* may be easily bent into any desired shape and the members *5'* will not decrease the flexibility of the same."

The patentee further says:

"The smooth surface is readily obtained by the dipping of these members in an acid solution, which will tend to soften these members and at the same time produce a thin film to flexibly connect the members *5'* where the head *7* and cup *6* join together."

Other forms of beads are shown in other figures. Unless the beads were connected together by the use of a solvent, they would catch the hair of the wearer. There must be a looseness between the beads or the temple would be absolutely rigid, and if to lessen the cracks the ends of the beads are inclined, they will twist about the core, giving cracks which are greatly exaggerated, and even altering the shape of the ear loop. If the beads are dipped, the solvent will quickly penetrate through the cracks to the inside, and cement the inside of the beads to the core.

In creating the film, if there was a slight solvent action it would quickly break open, and if there was a more complete solvent action there would be simply a solid mass of zylonite. The patentee naturally said: "The loop upon which the members are mounted may be either the plain or cable style, because the action of the solvent in the preferred form would produce what is virtually a heavy integral construction."

No form shown in this patent, to my mind, is really practical, and the preferred form is less practical than the others. This patent lacks the main body portion of celluloid, and also lacks a spiral wire loop, and, even if it had a spiral wire loop, impregnated with rigid zylonite, adhering thereto, it would not be an embodiment of the invention of the patent in suit. This patent taught nothing to the patentee of the patent in suit.

There was a Patent Office interference, involving the patent in suit (Clulee v. Stevens and Welsh, Interference No. 50,828), involving claims 6, 7, 10, and 11, and substantially the whole of that record has been offered in evidence by the defendants. The depositions of George E. Nerney and Edward E. Nerney were cut out of the interference record, but these witnesses were called as witnesses at the trial, as was also the witness Nelson.

Stevens et al. claim as their date of conception of the invention March, 1921, and that a temple embodying the invention was built about the same time and lost. Clulee claims as his date of conception of the invention August, 1921, and that a temple embodying the invention was built about the same time.

Plaintiff has not been able to identify any temple as the one then constructed, and this appears, not only by the evidence given on the interference, but also by that given on the trial. Stevens et al. had an effective filing date in May, 1922. Clulee filed in April, 1923, and no reduction to practice can be accorded to Clulee earlier than the fall of 1922.

Neither of the parties to the interference being able to produce the temple which it or they claim to have made about the time of their conception of the invention, priority cannot be awarded to either of them on that character of testimony. The examiner of interferences awarded priority to Stevens et al., and that award appears to have been in accordance with the evidence received on such interference, and I find nothing in the evidence offered on the trial which warrants me in finding that Clulee is entitled to priority.

The Assistant Commissioner of Patents having, on July 1, 1926, defined "flexible" as meaning anything which could be bent, the plaintiff, on October 23, 1923, filed the following disclaimer:

"The word 'flexible,' as used throughout the claims, and specifically claims 2, 3, 4, 7, 8, 9, and 10, is liable to too broad an interpretation, and, so interpreted, to cover elements not intended to be covered by this term, the liability to such possible interpretation not being intended or foreseen and thus being accidental, and it is hereby stated that the said term 'flexible,' as thus used, means nonsolid and self-adjusting, and having an ease of flexing of the order of that of a coiled member, and the term 'flexed,' as used in claim 7, implies flexibility as above defined, and any broader meaning or interpretation of such terms is hereby disclaimed.

"Further to clarify the term 'flexible,' not only in its intrinsic meaning, but with relation to the 'main body portion,' and to restrict the latter term and disclaim possible unduly broad interpretation thereof, it is hereby stated that by the term 'main body portion,' as used throughout the claims, is meant a member large in circumference and relatively nonflexible as a whole, as compared with the flexible metallic extension, and of a circumference substantially equal to or larger than the entire extension, metallic and nonmetallic, and a broader interpretation or meaning of the said term is hereby disclaimed."

[2] Defendants contend that the filing of the disclaimer constitutes an admission that the patent in suit, without disclaimer, would have been invalid. This contention, in my opinion, is erroneous. Walker (5th Ed.) p. 275, § 207; Permutit Co. v. Harvey Laundry Co. (D. C.) 274 F. 937, aff'd (C. C. A.) 279 F. 713; Permutit Co. v. Wadham (C. C. A.) 13 F.(2d) 454. This was not a disclaimer,

where a claim or claims had been held invalid by a court.

Plaintiff contends that it was a disclaimer intended to cure what appeared to be an ambiguity in the meaning of the claims, caused by the decision of the Assistant Commissioner of Patents. The practice of filing a disclaimer to cure an ambiguity has been indorsed. Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 22 S. Ct. 698, 46 L. Ed. 968; Simplex Railway Appliance Co. v. Pressed Steel Car Co. (C. C. A.) 189 F. 70, 72. There does not seem to have been any unreasonable delay in filing the disclaimer. Liquid Carbonic Co. v. Gilchrist Co. (C. C. A.) 253 F. 54.

The real question with reference to the disclaimer is whether by it plaintiff has simply removed an ambiguity, or has attempted to claim an invention which the patentee never had in mind. Defendants contend that by the disclaimer the claims have been rendered indefinite. This contention seems to be sustained, and further it appears that what was done by the disclaimer was to attempt to claim that which was not described or claimed in the patent in suit, and that plaintiff attempted to accomplish, by the so-called disclaimer, that which should properly have been accomplished by a surrender of the patent and reissue with proper claims.

Nonmetallic temples were not new, because the prior art shows the use of celluloid for the main body portion in some patents, for the hook portion in others, and for both main body and hook portions in others. The use of metallic cable cores was not new, the prior art showing that to be quite a common expedient. The winding of a metallic cable core with metal strips was not new, nor was it new to wind a metal core with strips of base metal and these with strips of gold.

Under these circumstances, it seems to me that a large number of claims were allowed for the combination of a very small number of elements, and the first inquiry naturally is: What was the invention of the patent in suit? Plaintiff contends that the three outstanding elements of the patent are (a) celluloid main portion; (b) metal cable core; (c) zylonite cable. The celluloid main body portion forms an element of every claim, but nothing is said in the patent about its stiffness, nor its dimensions with respect to the ear loop, except that it is larger than the metallic extension, since the latter enters within it.

As I read the specification, a metallic cable core is not mentioned therein; the only mention therein, about the extension being in the form of a wire, being where it says: "Within the recess 14 and from the rear end of the main portion 12 is inserted one end 15a of a metallic extension 15 taking the form of a wire of less diameter than the thickness of the main body portion 12."

This is followed by the statement: "The metallic extension 15, thus extending rearwardly of the main body portion 12, is preferably flexible, and accordingly preferably takes the form of a spirally wound wire member. * * *" The zylonite cable was not new, but was simply a substitution of material.

The main argument in favor of the metallic extension 15 seems to be its flexibility, and the patent says it "preferably takes the form of a spirally wound wire member." This does not, in my opinion, mean a straight wire, nor a cable wound on a straight wire core, because the specification of the patent in suit provides:

"The end portion 15a thereof is thereupon inserted in the recess 14 with a twisting movement, the latter being made in such manner that the spirally wound extension 15 tends to be more tightly wound as it is thus forced into the recess 14, thereby slightly reducing its diameter to permit a ready entry of the end portion 15a into the recess 14. After having inserted the end portion 15a to the desired degree the cessation of the twisting action imposed thereon permits the spirally wound member to tend to assume its normal diameter, and the thus resulting expansion thereof makes certain the positive interlocking of the end portion 15a of the extension 15 with the walls of the recess 14."

I do not believe this could be accomplished with a cable wound on a straight wire core, as such cables are shown in the prior art. The spirally wound wire member, in combination with the celluloid main portion and zylonite cable, I believe constitute the invention of the patent in suit, and the claims of the patent in suit are limited by the prior art, especially Laflin patent, No. 1,197,214, Siesel patent, No. 1,182,429, and Schwab patent, No. 1,337,330, to an extension in the form of a spirally wound wire member, even although any of such claims might be read to cover a metal cable core extension which was old in the art.

This view is sustained by the disclaimer to which reference has been made, because, if any effect is to be given to such disclaimer, it must be to limit the claims to the spirally

wound wire member. The patent is for a combination of old and well-known elements, but, in the combination described, accomplishing a better result. If the claims of the patent in suit have not been rendered uncertain by the filing of the disclaimer, then this patent is for an improvement, a step in advance in a crowded art, but in no sense a long step, and the claims are strictly limited by the prior art to the invention described in the patent, with but a limited range of equivalents.

Priority has been found to be in Stevens et al., and not in the invention of the patent in suit, as to claims 6, 7, 10, and 11. If, as plaintiff contends, the spirally wound wire member of the patent in suit and the cable core of the defendants' structure are equivalents, and defendants infringe, it is hard to see how plaintiff can escape from being anticipated by Laflin patent, No. 1,197,214.

In the Laflin patent, the butt section 1 consists of a base metal portion, inclosed in a layer of gold or precious metal, and the cable section 2 is likewise formed of a base portion surrounded by the coiled portion of precious metal. In Fig. III, a recess is drilled in the rear end of the butt portion, and, a portion of the precious metal covering having been unwound from the temple portion, it is inserted into the recess in the butt portion and soldered or swaged, as may be desired, and if secured by swaging the metal 5 down upon the core 3 of the cable portion 2, the metal 5 is caused to flow slightly over the outer portion of 2.

In another form, Fig. VI, the rear end of the butt portion is reduced in size by unwinding the gold covering and inserted into the core of the cable portion and then swaged. It is well to note that Laflin, the patentee, did not restrict himself to the use of gold for the outer covering of the butt and cable, because in his specification he said:

"While it will be understood that my invention is applicable to temples formed from any material, I have illustrated the same as used in forming temples of gold-filled material, this material being the hardest to work and make up satisfactorily, and my invention being particularly adapted for use with this form of material."

The Laflin patent was not cited by the examiner in the passing of the patent in suit, and this weakens the presumption of validity created by the granting of the patent in suit. A comparison of the defendants' structure with the Laflin patent shows that they are substantially identical, except that in defendants' structure a celluloid main portion has been substituted for the gold main portion of Laflin, and likewise defendants have substituted an outer helix of celluloid for Laflin's outer helix of gold, on the earpiece. The joints are substantially the same, as in both a socket is formed in the rear end of the main body of the temple, into which the end of the cable is inserted.

Of course, the defendants cannot use the metal solder used by Laflin, because metal solder cannot be used on celluloid, and defendants force the end of the cable into the socket, by wrapping or sliding over the end of the cable a metal sleeve on which two wings or anchors are formed, and forcing the end of the cable covered by the sleeve into the socket. The wings or anchors prevent the cable from rotating or being removed. On the outer end of the defendants' cable is an upset, knob, or stop.

Defendants' cable has as its outer covering a one-piece slotted or helical celluloid sleeve, which is attached to the main body portion with cement, and is molded over the knob or stop at the end of the cable, to form a tight joint therewith and prevent movement of the celluloid on the cable.

While there have been some exceptions made to the rule that there is no invention in the substitution of material, plaintiff cannot bring the patent in suit under such exceptions, because the use of celluloid as a covering for both the main body and the earpiece portions of eyeglass temples was old and well known, and there has not been general acquiescence in the validity of the patent in suit by the public; in fact, the alleged infringement is very general. George Frost Co. v. Cohn (C. C. A.) 119 F. 505.

The plaintiff's commercial structure is not an embodiment of the patent in suit. A comparison shows that the commercial structure has a solid, straight central wire, upon which the coiled wire is wound for the earpiece, instead of the spirally wound wire member of the patent in suit.

The method of attachment of the metal member of the earpiece with the end of the main body portion of the commercial structure is that used by the defendants, and not that of the patent in suit, and no celluloid nipple 12b of the patent in suit is found in such structure. The celluloid about the outside of the earpiece does not have the inside curved face 16b, the importance of which is described in the patent.

The celluloid cap or abutment at the end of the earpiece, in the commercial structure,

is screw-threaded upon the outside of the wire-wound cable core, instead of being cemented to the spirally wound core member of the patent in suit. The commercial structure has a nesting of the concave convex sides, which the patent does not have, and the commercial structure has the metal sleeve or tube used by the defendants, extending from within the main body portion and into the celluloid covering of the earpiece, which the patent does not have.

Plaintiff has urged, in support of novelty and invention in the patent in suit, great commercial success, but the evidence offered is general rather than specific; in any event, whatever success the plaintiff may have had, it has been with the commercial structure, as the same has been described, and not with the patent in suit, and the plaintiff's commercial structure is nearer to the defendants' than it is to the patent in suit. The defendants' structure differs from the patent in suit, in that it has as the metal core of the earpiece a solid, straight wire, around which other wires are wound, instead of the spirally wound wire member, without any straight wire inside, of the patent in suit.

Defendants push the end of the metal core of the earpiece into the end of the main body portion, as shown in the McDonnell patent, No. 1,225,343, and cement the celluloid covering of the earpiece to the main body portion, instead of reducing the normal size of the metal member by twisting, and then allowing it to expand and engage the main body portion, as described in the patent in suit. The celluloid nipple *12b* on the end of the main body portion described in the patent in suit, is not found on the defendants' structure; but the defendants have a metal sleeve surrounding the metal core at the end of the earpiece, where it is joined with the main body portion. The sleeve extends within the celluloid covering of the earpiece, and also covers the protruding portion of the core, being provided with fins, so that, when the protruding portion so covered is pressed into the recess in the main body portion, it is secured by the fins and stiffens the metal core at the point where the end of the celluloid covering of the earpiece is cemented to the main body portion.

The celluloid covering of the earpiece of the defendants' structure is not that of the patent in suit, and defendants have no separate celluloid cap or abutment of the patent in suit; but the celluloid tube covering is simply molded down about the end of the metal core. Assuming the validity of the patent in suit, as I have limited the construction of the claims in suit, the defendants in their structure have not followed its teaching, but have gone to the prior art, and their structure does not infringe.

### Patent No. 1,527,118.

[3] Only one feature of this patent is involved in this suit, and that is the stiffening of the metal core adjacent to its junction with the end of the main body portion. Such stiffening was old in the art, a common way being to allow the solder to extend for a distance beyond the point of joining.

In the prior patent in suit, the part is stiffened by the celluloid nipple *12b*, and in this later patent the stiffening is to be accomplished by making the metal part more rigid, as described in the patent:

"The flexible portion *14a* of the member *14* and the more rigid portion *14b* thereof may be formed from two separate members secured together as by soldering at the point *14c*. Preferably, however, the member *14* is formed from one continuous member of spirally wound wire, as above mentioned, and the more rigid portion thereof is formed by soldering together the adjacent coils of that portion."

In the Day patent, No. 1,335,823, Figs. 4 and 7, the core *5* is thickened adjacent the main body portion where the winding *10* upon it joins the main body portion.

A disclaimer was filed, which plaintiff contends was intended to cure what appeared to be an ambiguity, and what I said with reference to the disclaimer in the prior patent in suit applies to this disclaimer, and need not be repeated. If, however, the disclaimer did not render the claims so uncertain as to make them invalid, then its effect is to make it certain that the spirally wound wire member does not mean a straight wire core with wire wound around it.

The claims of this patent, 12 to 17, inclusive, 19, 20, and 25, on which suit is based, if the patent has not been rendered invalid by the disclaimer, are strictly limited by the prior art to the manner of stiffening in said patent described, with a limited range of equivalents. Plaintiff itself does not utilize the subject-matter of the patent in suit, in its commercial structure, but uses the sleeve used by the defendants.

Assuming the validity of the patent in suit, there is no infringement, because in the defendants' structure stiffening is produced by placing a metal tube or sleeve about the core, and not by making the core itself stiff,

as described in the patent in suit, and the claims of the patent in suit sued on are not infringed.

A decree may be entered in favor of defendants against plaintiff, dismissing the bill of complaint, with costs. Settle decree on notice.