## VAN METER v. IRVING AIR CHUTE CO.
## SAME v. UNITED STATES.

District Court, W. D. New York. June 8, 1928.

1. Patents ⊚⇒157(3)—Claim must be given reasonable interpretation, in light of description, to carry out object of invention.

Claim of patent must be given reasonable interpretation, in the light of the description, to fairly carry out the object of the invention.

2. Patents ⊚⇒149—Statutory disclaimer is available to limit claim of patent, and is valid, unless character of invention is materially changed, or claim enlarged.

Resort to statutory disclaimer may properly be had to limit scope of a claim of a patent to a particular class or form to which the devise belongs, and such disclaimer is valid, unless there is a material change in the character of the invention, or the claim is enlarged.

3. Patents ⊚⇒154—Disclaimer, limiting scope of patent for apparatus for expansion of parachute to parachute carried on person of user held valid.

In suit for infringement of Van Meter patent, No. 1,192,479, claim 2, for a device for the expansion of a parachute, disclaimer, limiting scope of claim to parachute carried on the body of the user, known as "free" or "jump" type, and distinguishing it from the "soaring" type, held valid, in view of specification.

4. Patents ⊚⇒118, 167(1½)—Mistake in illustration did not render patent invalid, or limit claim sought to be illustrated.

Patent was not rendered invalid, or claim limited to illustration, where illustration was faulty, due to mistake or lack of understanding of draftsman.

5. Patents ⊚⇒245(1)—To avoid claim of infringement, defendant must show that he does not employ plaintiff's device, or obtain same result by substantially equivalent means.

To avoid infringement, proof must show that combination in suit is not employed by the defendant, and that the same result is not obtained by substantially equivalent means.

6. Patents ⊚⇒328—1,192,479, claim 2, for expansion device for parachute apparatus, held valid and infringed.

Van Meter patent, No. 1,192,479, claim 2, for device for expanding parachute, limited to parachutes carried on person of user, held valid and infringed, in suit against alleged infringer and against United States for damages, under Act March 4, 1925 (43 Stat. 1601).

7. Patents ⊚⇒245(1), 246—Infringement is not avoided by omission of part of combination, and substitution of another part, acting in substantially identical manner, though result is obtained by simpler means.

While principle of respective operations must be the same, together with substantial

identity of means, to constitute infringement, infringement is not avoided by omitting part of combination and adopting another part, which operates in substantially the same way, though by simpler means.

In Equity and at Law. Suits by Solomon Lee Van Meter, Jr., in equity against the Irving Air Chute Company, and at law against the United States. Decree for plaintiff.

John S. Powers, of Buffalo, N. Y. (Melville Church, Clarence B. Des Jardins and C. C. Calhoun, all of Washington, D. C., of counsel), for plaintiff.

Botsford, Mitchell, Albro & Weber, of Buffalo, N. Y. (Royal R. Rommel, of Washington, D. C., of counsel), for defendant Irving Air Chute Co.

Richard A. Grimm, Asst. U. S. Atty., of Buffalo, N. Y. (Harry E. Knight, of Washington, D. C., and Herman Galloway, Asst. Atty. Gen., of counsel), for the United States.

HAZEL, District Judge. In these two cases, tried as one, the evidence taken is admittedly applicable to both. The action against the Irving Air Chute Company is in equity and avers infringement of United States letters patent No. 1,192,479, issued July 25, 1916, to Solomon Lee Van Meter, Jr., for parachute apparatus or "aviatory life buoy," while the action against the United States is at law, wherein trial by jury has been waived, to recover damages for unlicensed use and manufacture by the United States, or for the United States by the defendant Irving Air Chute Company, of the invention described in the patent in controversy.

The plaintiff is first lieutenant in the Air Service of the United States Army, commissioned in November, 1917, and was prohibited from suing the United States for infringement of his patent until the removal of his disability by a special act of Congress, 43 Stat. pt. 2, p. 1601, c. 587, whereby jurisdiction was conferred upon the Court of Claims or the District Courts of the United States to examine and adjudicate his claim of infringement and unlicensed use of the invention for which a patent was issued to him prior to his entry into the service of the United States. The Irving Air Chute Company is engaged in this district in the manufacture of the alleged infringing apparatus.

The patent, in outline, describes and claims a parachute canopy and mechanical means for its operation for instant use in saving lives of aviators, by enabling safe descent to earth from the airplane in case of accident, or whenever the aviator's safety is endangered. Admittedly parachutes, as instrumentalities for retarding descent of operators or occupants of airplanes, airships, or balloons, are old—extremely old, when used in connection with flights in balloons—yet the primary object of the patentee, as stated in the specification, was to produce a safety device by a new and novel combination of elements for immediate use and release of the parachute when danger is imminent, and of a character to bear the weight of the user in the air and quickly expand the parachute, so that resistance of the air would retard descent and insure safe landing.

The described parachute canopy of silk or fabric is located in a locked casing or cap, preferably made of aluminum, attached to the body plate, and capable of detachment or manual release therefrom. The plate to which the casing is attached is strapped to the back of the user, and the casing is released at his will, by a pull upon a line or cord, which causes its cover, wherein mechanical means for release are contained, to be forcibly thrown aside or from the plane. Co-operating means are also inclosed in the casing to quickly open the chute and speed up expansion, by allowing the air to rush in at its partly open mouth. Upon full expansion, which occurs in most instances after the user has leaped from the plane, his downward fall is rapidly checked, owing to the attachment of the parachute to the body plate, and the user descends to the ground.

Claim 2 only is in issue, and is for a combination of elements, to wit: (1) A parachute having means for confining the same in the cap or casing; (2) means for carrying it in a confined state; (3) means for its release; (4) means for facilitating the expansion of the canopy after its release, to effectuate the purpose of the invention. The exact, original wording of the claim is as follows:

"2. The combination with a parachute of expansible means therefor, means operable to hold said expansible means normally inoperative, said holding means being automatically detachable from the parachute upon the release thereof, and means to release said holding means."

The patentee claims that he was the first to combine old instrumentalities, used in prior structures, in such a way as to enable the aviator or user, while carrying the parachute on his back, to freely move from his

seat to a position where he may jump or be lifted from the plane before releasing the casing in which the parachute is enclosed.

During the hearing, and following defendant's testimony bearing upon anticipation, plaintiff submitted a notice of disclaimer, filed on the succeeding day in the Patent Office, by adding at the end of claim 2 the words:

"Except when such combination is embodied in a free type manually operated parachute apparatus carried on the person of the user and sometimes referred to as a parachute pack of the 'jump' type."

By the disclaimer the scope of the involved claim was narrowed and limited to a parachute carried on the person of the user —a parachute of what has become known, in service, as the "free" or "jump" type, to distinguish it from the "soaring" type, and one without means of direct attachment to the body of the airplane.

The defenses are invalidity of the disclaimer, estoppel by acquiescence in the cancellation of original claims, abandonment by the patentee of the jump type apparatus, anticipation, prior use, lack of utility, and noninfringement.

The attack on the validity of the disclaimer will be considered first. It is insisted that there is imported into the claim new matter of far-reaching importance, viz. a new and distinct feature, consisting of a manually operated parachute structure carried on the person of the wearer—a feature not specifically or inferentially included in the specification, drawings, or claim; and in argument it is said, inter alia, that the concept of the inventor finds accurate illustration in Fig. 12 of the drawing, showing the aviator seated in the plane after the parachute was ejected from its confinement, for the purpose of lifting or drawing him free of the plane for the descent, thus indicating the object of the patentee to invent a soaring type of parachute, which was and is inapplicable for safely jumping from the plane and opening the parachute while the aviator or wearer is descending. The specification, however, I am convinced, does not bear out this narrow interpretation.

The general construction of the apparatus and its rigging or harness around the body of the wearer implies its use, in case of necessity, at and from other parts of the plane, and, indeed, for jumping free of the plane. The aviator or wearer has control of the release cord, and, on jerking it, the casing is at once cast aside, the parachute is freed, the shroud lines aligned, and the chute

is subject to the air currents. The various springs for ejecting the parachute from the cap and the mesh frame function promptly to open and hold open the mouth of the canopy to allow expansion by the air currents. That this may occur automatically, at the instant the wearer pulls the cord and while away from his seat, or in the air after dropping from the plane, is reasonably clear upon reading the specification, wherein it is stated:

"In the operation of the device, in order to put the parachute into service, the operator pulls on the line 16, which releases the catches 11 and 12 from the retaining members 8, which in turn release the springs 19 and 20, permitting these springs to force the cap 4 and the parachute inclosed thereby outwardly away from the plate 1 so as to cast the parachute freely into the air. When the cap 4 is thus cast into the air *the spring 35 will serve to separate the parachute and cap and the confined spring 37 will spring outwardly expanding the throat of the parachute so that the same will readily catch the air.*" (Italics mine.)

[1] It will be noted that expansion is hastened by the spring at the edge of the frame, which functions to expand the throat of the chute. It is an essential element of the successful use of the contrivance. The claim is broad, and of course must be given reasonable interpretation, in the light of the description and to fairly carry out the object of the invention.

[2-4] The limitation introduced by the disclaimer was apparently in contemplation, and may justly, I think, be read into the claim as a means for expanding the parachute, even though no specific words are used in the description to indicate a differentiation of the free type or jump type parachute from the soaring type, which, as I understand it, comprises parachutes that are not carried on the person of the user. Resort to statutory disclaimer no doubt may properly be had, to limit the scope of a claim to a particular class or form to which the device belongs, and such a disclaimer is valid, unless there is a material change in the character of the invention or enlargement of the claim. Haile's Co. v. Albany Stove Works, 123 U. S. at page 587, 8 S. Ct. 262, 31 L. Ed. 284; Strause Gas I. Co. v. Crane Co. (C. C. A.) 235 F. 136. And see Simplex Ry. Co. v. Pressed Steel Car Co. (C. C. A.) 189 F. 70; Permutit Co. v. Harvey Laundry (C. C. A.) 279 F. 713, affirming (D. C.) 274 F. 937; also Permutit Co. v. Wadham (C. C. A.) 13 F.(2d) 454. In

Thompson v. Bushnell Co. (C. C. A.) 96 F. 238, the disclaimer in terms limited the claim to hack and band saws, eliminating circular saws, and the Circuit Court of Appeals for this circuit ruled that saws of another kind were included.

The recognition by the disclaimer of a different species of parachute, without specifically referring to a class, is insufficient cause for invalidity, since the description fairly implies that the apparatus is usable for jumping from the plane, regardless of the position of the user, and that he is free to operate the parachute after dropping from the plane. That in a letter to his commanding officer (Exhibit 38–B) Van Meter referred to the patent as an impractical jump chute, and suggested abandoning it, is not to be taken literally. He manifestly did not at that time understand, or perhaps even contemplate, the nature of his invention. In Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267, the Supreme Court held that an inventor "is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not." See, also, Thomson Meter Co. v. National Meter Co. (C. C. A.) 65 F. 427, and Diamond R. Co. v. Cons. Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527.

Generally abandonment is a question of fact, and, in my opinion, declarations of abandonment by the inventor must be accompanied by acts, or at least a plain intention to dedicate his invention to the public. Pitts v. Hall, Fed. Cas. No. 11,192, 2 Blatchf. 230. All the testimony on this point negatives such intention, and, indeed, it may be that Van Meter intended to refer to his soaring type, described in his patent No. 1,192,480, on a later application. In any event, I discover nothing in the file wrapper and contents (Exhibit No. 42) to prove an intention to abandon the invention in suit by reason of the grant of his soaring type parachute. Van Meter's evidence certainly shows activity on his part in attempting to secure recognition of his invention, but his attempts fell on deaf ears.

The asserted lack of utility in plaintiff's device is not sufficiently proven. It is true the expert witnesses agreed, and I daresay it is obvious, that it would be hazardous for the wearer to pull the cord of the parachute in question, for throwing aside the casing and opening the chute while he continued in his seat, as shown in Fig. 12 of the patent drawings, since the air currents, it can scarcely be doubted, would entangle the shroud lines or carry the fabric to the rear part of the plane, and cause collision therewith, to the serious injury of the wearer, who is held to the chute by the suspensory cords attached to the plate on his back. This was evidently a misconception of the draftsman of the sketch. The patent is not invalid, or the claim limited to the illustration, because of this mistake or lack of understanding. See Temple Pump Co. v. Goss Pump Co. (C. C. A.) 58 F. at page 204.

Nor does plaintiff's invention lack utility, as contended, because of any forced expansion at the mouth of the parachute, instead of before the user, or behind him. Maj. Hoffman, on this point, stated that the apparatus is operable as a pack or jump type of parachute; that it could be used for jumping from the plane, if "you supposed it was of the jump type," and he said: "It might be operated successfully now and then, and would not foul if made of good material," and further that he did not regard it as a developed idea. It was obviously crudely constructed, compared with defendant's parachute pack, the infringing device; but it was nevertheless operable and practicable, even though it did not work smoothly or with perfection. Hildreth v. Mastoras, 257 U. S. 27, 34, 42 S. Ct. 20, 66 L. Ed. 112. The comparative test with 200-pound weights between the plaintiff's and defendant's apparatus, reproduced in moving pictures in court, showed good operativeness, form, and drops of the weights from the planes at the same instant of time.

Various prior patents and publications asserted to be anticipatory of the patent in suit were introduced in evidence, but, since none of them include the combination of elements of claim 2, they were not anticipations.

In the Fowler patent the suspensory cords of the parachute were wound on a drum in the fusilage of the airplane; the parachute being pulled out by a small umbrella on the peak of the parachute, upon becoming responsive to the air currents (evidently performing the same function fulfilled by defendant's pilot parachute). But the Fowler parachute was not connected with the body of the aviator, nor were its normal expanding means confined in a pack or casing. The device was evidently designed to support the plane in case of accident, and to insure safe landing of the aviator.

[5] Whether defendant's adaptation of means for quickly expanding the main chute to facilitate air inflation avoids infringement depends upon whether the principle of its

entire operation is the same as plaintiff's. The proof must show that the combination in suit is not employed by defendant, and that the same result is not attained by substantially equivalent means. But to this phase I will refer later on, when treating of the defense of noninfringement.

The Nelson patent, No. 1,019,271, dated March, 1912, was granted while Van Meter's application was pending in the Patent Office and hence may be considered as bearing on the prior state of the art. It discloses a parachute normally kept in a casing on the upper wing of the airplane, and apparently was used for supporting the latter in case of accident. The specification states that the parachute may be carried on the person or connected to the airplane, and merely shows its connection with the latter. Expansion of the parachute is effected by use of a gas tank and connecting tubes and ribs and rings. It was never thought to be a practical device, and, as far as shown, has never been used, and defendant's expert witnesses doubted its practicability. It fails to show an apparatus wherein the chute and expanding means are confined in a casing or pack for release by a pull on a rip cord, as in plaintiff's and defendant's structures.

The Tanner patent was also allowed after the filing date of the plaintiff's patent. It is not anticipatory. It was designed for supporting the plane, though the patentee states that it may be carried on the back of the aeronaut. It has some of the elements of the Van Meter patent, but does not disclose the assemblage of elements. It has no means for expanding the chute, or for quickening its expansion after the canopy has been forcibly expelled from the housing or tubes wherein it is contained.

Willard's patent of June 4, 1912, which was also granted after Van Meter's filing date, though his application was earlier, requires attention. He discloses mechanical features for releasing the umbrella and causing spring arms, or a spring-actuated member, to spread apart to allow air to enter the mouth of the compactly folded parachute, for expansion, after a fall of a few feet. The device is not located on the airplane, and is not attached to the body of the aviator. In using the parachute, the aviator grasps a handle and pulls on triggers, and, on leaving the plane, takes the structure with him. In jumping free of the plane, he would be required to hold on with one hand and press triggers with the other to open the chute. The pointed hooks, which the specification states may engage the user's belt or clothing in making the descent, are a risky expedient, and one that to my mind fails to give assurance of reasonable safety. It has no means for assisting expansion of the parachute confined within a casing or pack attached to the body of the user, and, in my opinion, is not anticipatory.

The Ulmer patent of January 31, 1911, is for a parachute packed in a cap worn by the user. True enough, it was perhaps the first free jump type parachute to be carried by the aviator. However, the arrangement of the parts is such as to make its practicability extremely doubtful. The defendant's expert Browne was of that opinion, and I agree with him. Anyway, no means are shown for holding the Ulmer parachute confined with the expanding means in a casing, and no instrumentalities are shown for ejecting the parachute, or taking it out of the compartment in the hat of the aviator. It is incredible that the cap or hat could enfold a parachute of the size required to sustain the wearer in his downward movements from the plane.

The French patents to Wade-Brown and Esnault-Pelterie likewise have been examined by me, but I find that they are not anticipatory. Their practicability is quite uncertain. In Wade-Brown the parachute is contained in a long tube open at the upper end. The parachute or umbrella container is not carried on the back of the aviator. The umbrella is ejected from the tube by a spring attachment. The tube, according to defendant's expert witnesses, would need to be fully 20 to 30 feet long to inclose a parachute of the size required, and could only with difficulty be placed in an airplane. It is not a jump type apparatus.

In the second French patent mentioned is shown a parachute of the soaring type, normally housed somewhere on the plane and released by the pilot for expansion. The apparatus, defendants' witnesses agree, would be dangerous in use, since it might drag the pilot into the tail members of the plane.

These devices were evidently failures, and in the main were discarded as unworkable. The prior art in no instance discloses a parachute with expanding means confined within a casing fastened to the body of the wearer, and freed by means responsive to the will of the operator.

[6] Considerable prior use testimony was taken, but I find that none is sufficiently convincing to require holding the patent anticipated or limited in scope on account thereof. Defendant relies upon oral testi-

mony with relation to these devices, which were unpatented, without production of any specimens made prior to the filing date of the Van Meter patent, nor any documentary evidence showing how the parachute apparatuses were used by aeronauts in dropping or leaping from their balloons. True enough, notable jumps from balloons high in the air were made and safe landings accomplished, but the combination in suit is not found in any of these devices.

In the witness Stevens' parachute jumps, the parachute was attached to the balloon by a rope, and, on dropping, it was first necessary to pull a cord, so as to cause a knife blade to cut the rope for releasing the parachute, which was then opened by air currents. The parachute was not confined in a casing. Stevens used various devices in dropping from his balloon; but, aside from the use of a parachute and shroud lines, there is no similarity to the Van Meter structure. These devices in each instance were attached to the balloon, the aeronaut releasing the chute by jumping and breaking the line or rope that held the device to the balloon. He also used a back type parachute, which was developed in 1908, and used for exhibition purposes from 1911 to 1916, after Van Meter's filing date. It cannot be considered as prior public use, and the evidence of prior invention in 1908, and subsequent reduction to practice prior to actual use, is not of a convincing character.

The witness Hutchison, in his public exhibitions, used a shell, tied to the balloon, with a removable bottom, wherein the jumper stood; the parachute being confined in a sack, with its mouth open, and fastened to his person. In making the jump from the plane, he pulled two cords; one releasing the bottom of the shell and the other cutting the cord to release the parachute at the bottom of the sack. By this arrangement he dropped from the shell, carrying the parachute with him. But such a feat, and its adaptations, in my opinion, were not anticipatory. Moreover, the parachute was not enclosed in a casing or pack carried by the jumper, but was attached to the balloon, from which release was necessary by cutting before it could expand or take in the air.

Murray, in 1906, used a pack type parachute folded in a sack and carried on his back. The parachute was freed by pulling a cord, while the sack inclosing it had rubber bands, which were used to pull back the flaps of the container to open its mouth. Pulling the cord broke the threads, so that the rubber bands opened the sack from which the parachute expanded. No model or writing to corroborate him in the use of his pack was submitted, and hence the testimony is not of the convincing character to establish prior use.

There were other witnesses who had been jumpers from balloons with a free type parachute as early as 1907 or 1908; but, though the use of separate elements were embodied in these structures, the combination of elements in suit was lacking. It is quite true that various of the prior patents and publications and testimony as to prior use disclosed that the separate elements of Van Meter's combination were old; but nevertheless the proof in its entirety convinces me that the patentee was the first to unite these elements in a new and useful combination. The essential elements of the disclaimer, no doubt, were the means for quickening the opening of the parachute and confining them in a casing on the body of the wearer, disconnected from the airplane. This idea is not present in the prior patents or structures. The location of the parachute in compartments or receptacles of one kind or another, either on the planes or balloons, necessitated the release of the chute while the wearer was still on the plane or in the balloon, or where the releasing line was not free for manual use. This is not suggestive of plaintiff's invention. It is doubtful whether such devices would be safe means for jumping from the plane in case of accident, for the plane would doubtless fall as rapidly as the pilot, and menace his safety after opening the chute.

Van Meter, in carrying out his safety idea, by combining old elements to co-operate in unison, has made an advance in the adaptation of this type of parachute, and he rightly invokes a reasonable range of equivalents.

The defendant's parachute pack is not essentially different from complainant's. It comprises a harness strapped to the back of the wearer in a convenient way for sitting thereon. Suspensory cords on the parachute are fastened at the lower ends to the harness, and, in lieu of plaintiff's aluminum container, a canvas container incloses the parachute, together with a pilot chute for hastening and insuring expansion of the former. That speeding up is accomplished for a few seconds, during which the fall would approximate 50 feet, is shown by the evidence of Maj. Hoffman. Suspensory cords, extending from the pilot chute, are attached to the peak of the main chute, while springs in the pilot chute insure immediate expansion.

Both these chutes and lines are compactly folded at the bottom of the canvas pack, which is closed by overlapping flaps snugly folded over the contents; the flaps being fastened by wires fitting into studs connected to the rip cord, while elastic bands are used to hasten the opening of the pack and for quickly releasing the parachutes.

In complainant's structure, as heretofore pointed out, the instrumentalities for expansion comprise a mesh frame, which opens the mouth of the parachute to permit the air currents to enter, while the spring (*37*) located on its edge aids in keeping the mouth open, and flat springs in co-operation for projecting the cap away from the body plate. In defendant's structure there are no similar means for opening the mouth or holding it open. Reliance for expansion is entirely placed upon the aforementioned elastic bands, which operate to widely open the container, and, upon pulling the release cord, enable the parachute to take the air; the function of the pilot chute, owing to the use of an expanding spring, causing the main parachute to open up quickly and drag it into the air, where the air currents fully expand it. By this adaptation defendant uses equivalent means for insuring the necessary expansion. The cover flaps of the pack, held in place by wires extending through studs, are withdrawn upon pulling the rip cord for initial opening, and comprise means equivalent to the described means for opening the inelastic cover or cap of plaintiff's structure.

[7] Defendant's adaptation for expansion is not, as contended, on a different principle from plaintiff's, and by using the pilot chute to accomplish this purpose infringement is not avoided. It makes no material difference that the expansion means are at upper end of the parachute. It is true that, to constitute infringement, the principle of the respective operations must be the same, and, moreover, there must be substantial identity of means, and not merely of function and result. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136. But, in my opinion, as already remarked, defendant achieves the same result by his expanding means as is obtained by the plaintiff's adaptation.

It is well settled in patent law that infringement of a combination is not avoided by omitting a part and in its place adapting another, which operates in substantially the same way, even though the result is attained by simpler means. The use of the pilot chute was not a colorable change or alteration, and, indeed, has resulted in a better and simpler method in this relation. It was, however, not a new discovery or method of expanding a major parachute. Such a device for a similar purpose is shown in the prior art, and therefore its use was a mere substitution of equivalent means for achieving the same result as that achieved by plaintiff's patent.

My conclusion is that claim 2, as limited by the disclaimer, is valid and infringed by the defendants. The findings of fact submitted by plaintiff have been signed, and decree for plaintiff may be entered.