**IRVING AIR CHUTE CO., Inc., et al. v. RUSSELL PARACHUTE CO.**

**No. 728.**

District Court, D. Delaware.

June 3, 1930.

Charles Neave and Alexander C. Neave (of Fish, Richardson & Neave), both of New York City, Roy R. Rommel, of Washington, D. C., and William G. Mahaffy, of Wilmington, Del., for plaintiffs.

Hubert Howson, of New York City, Harry E. Knight, of Washington, D. C., and Charles C. Keedy, of Wilmington, Del., for defendant.

MORRIS, District Judge.

Three patents relating to parachute packs are here in issue. In each Floyd Smith is the patentee. All are owned by the Floyd Smith Aerial Equipment Company, one of the plaintiffs. The other plaintiff, Irving Air Chute Company, Inc., holds a license thereunder that is exclusive save for a nonexclusive license to the United States. Russell Parachute Company, the defendant, manufactures a parachute pack which, plaintiffs charge, infringes claims 1, 2, 3, 4, and 10 of patent No. 1,340,423 granted May 18, 1920, claims 1, 11, 12, 15, and 18 of patent No. 1,462,456 granted July 17, 1923, and claims 5 and 8 of patent No. 1,403,983 granted January 17, 1922. The patents were applied for in the order in which they are here referred to. The defenses of invalidity and noninfringement with respect to the first two of these patents are both predicated largely upon the prior art constructions disclosed in patent No. 1,-192,479 granted July 25, 1916, to S. L. Van Meter, Jr., upon an application filed March 27, 1911, and in French patent No. 474,019 to Bacque published February 4, 1915, and upon the unpatented prior art packs of Broadwick and of Stevens. Infringement of claim 8 of the third patent is denied, and claims 5 and 8 of that patent are both asserted to be invalid for want of invention, particularly in view of the old tailoring art.

In the early days of ballooning, the chute, connected by its shrouds or other suspending members to straps, coat, or harness worn by the balloonist and attached at its peak to the basket by a light cord readily broken by the weight of the descending aeronaut when the lines of the parachute were made taut, was frequently permitted to drape uninclosed from the basket. Later the chute was packed in a bag attached at its upper or permanently closed end to the basket and having its lower end closed by cords of sufficient strength to prevent the chute's falling out of the bag, yet light enough to be readily broken by the weight of the jumper when the shrouds or other suspending members projecting from the bag and attached to the jumper's harness were made taut by his descent. Sometimes the peak of the chute was likewise attached by a light break cord to the inside of the bag. Still later the parachute was carried on the person of the aeronaut or aviator in an inclosing cover as a pack.

Sometimes the cover, held about the chute by light break cords, was removed by the co-operation of the weight of the jumper and a strong cord attaching the cover to the aircraft. Again, as disclosed by the prior art patents, there was no attachment whatever of chute or cover to the aircraft. In such cases the chute was manually released from its cover during the descent of the jumper by means of a pull cord running from the pack to the front of the harness. Chutes attached in any manner to the aircraft were and are known as the "attached," "automatic," or, since it was commonly used by balloonists, the "balloon" type. The unattached type was and is known as the "free jump" type. Both types were well known to the art before Smith filed on July 27, 1918, his application for the first of his patents in suit.

Referring to the attached type, Smith in his first patent said: "This type of parachute has a decided disadvantage in that it depends upon the aviator being able to jump and drop away from the airplane in order to extend the parachute and cause it to open. If the airplane is falling and the aviator cannot get away from it he may then merely fall with the plane." A stated object of his invention was "to provide a parachute apparatus which is simple in construction, light in weight and effective and dependable in action." A feature of his invention which he said in his specification would overcome the disadvantage of the attached type was "the use of a small automatically operating parachute [attached to the peak of the main chute] to be used as a means for relatively anchoring or holding the upper end of the main parachute to extend the main parachute and thus cause it to properly open. I provide a small auxiliary parachute having ribs which are resiliently operated in some manner so as to automatically open when the parachute is released from the pack. This small parachute will catch the air and will extend the main parachute, if the aviator is either falling through the air alone or falling with his machine. If he is falling with his machine the main parachute will lift him off the machine when it opens." He adds: "However in order to make sure of the large parachute catching the air I may provide its lower edge with ribs (any number may be used spaced around the lower edge). * * *" The described preferred form of apparatus includes the auxiliary chute with an option to use, or not, ribs on the lower edge of the main chute. In fact, there is in the specification nothing to indicate that Smith's device, intended, at least primarily, as a "free jump" device,

could be used with safety without the auxiliary chute, yet the claims in issue asserted to be typical of those in suit neither expressly limit the invention to a "free jump" type of pack nor include as an element the auxiliary chute. These claims are:

"1. In combination, a parachute folded into a compact mass and having suspending members, a sheet of flexible material folded about said parachute and permitting the ends of said suspending members to project, releasable fastening means between each edge of the sheet and some other portion of the sheet, a releasing device, and means connecting said fastening means to said releasing device."

"10. In combination, a parachute folded into a compact mass and having suspending members, a sheet of flexible material folded about said parachute and permitting the ends of said flexible member (misprint for 'suspending members') to project, releasable fastening means between each edge of the sheet and some other portion of the sheet, and means for simultaneously releasing said fastening means and drawing back portions of the sheet to expose the parachute."

Manifestly these claims are directed more particularly to the pack cover and to the means by which it may be retained about and removed from the inclosed parachute, of whatever design, rather than to the specific form of parachute inclosed, or to the question of whether the opening of the pack is to be brought about by a manual pull upon a cord as the jumper is falling through the air or by the combined action of the weight of the falling jumper and a cord attached to the aircraft. With respect to the pack or cover the specification states: "The back of the harness carries a pack 20 of some fabric material, the sides of which are folded over and meet along the center of the back of the pack at 21 and the ends of which may be folded over in any suitable manner under or over the folded sides as indicated at 22. The folded sides are held together by any suitable releasable means. For instance these folded sides, and ends, may be held together by a thread tie or loop as indicated at 23; and then to the edges of these folded sides cords 24 may be attached, the cords being of sufficient strength to cause [the] loops to be broken when the wearer pulls on these cords. These cords may be extended around to the front of the harness where they may be run together or attached to a single strap or any other member as indicated at 25 which may be extended across the wearer's breast, with a central ring 25a or other handle easy for

the wearer to grasp. A pull upon the handle 25a will cause the thread ties of the pack to break and will allow the pack to open."

Wherein, if at all, was Smith's pack an improvement over the packs of the prior art? In the French patent to Bacque the parachute was folded and placed on a flat, rectangular, open-work frame attached to that part of the harness which passed over the aviator's back. Over the folded chute was placed the retractile cover, "embrasse," hinged at one corner to the frame and latched at its other three corners to the other three corners of the frame. These three catches were controlled by wires or the like running to the rim of a central wheel which was rotated by another wire running from the rim of the wheel to the aviator's belt or harness. When the aviator desired to use his parachute, a pull upon the last-mentioned wire turned the wheel sufficiently to release the three catches, terminate the withholding effect of the "embrasse," and free the parachute. The ends of the shroud lines projected out of the pack just above the frame for attachment to the harness. The Bacque pack was concededly a "free jump" pack.

Van Meter had described in his patent a pack comprising a body plate secured to the back of the aviator by straps and a parachute casing preferably made of aluminum detachably connected to the plate by opposite terminal lugs. The cap was released at the will of the aviator by a pull exerted by him upon a line running from the pack to an accessible position on his chest. Upon the release of the cap, springs contained therein forced both the cap and the parachute inclosed therein away from the plate and apart from each other. The shrouds projected from the pack and were attached to the reverse side of the plate and to the harness. To prevent entanglement of the cords upon the opening of the pack, they were wound in convolutions upon the plate, covered by a frangible sheath of paper tied thereover by readily breakable crossing strips of twine that were broken when the parachute caught the air. In Van Meter v. Irving Air Chute Co. (Van Meter v. United States) (D. C.) 27 F.(2d) 170, Judge Hazel expressly held, and I think correctly, that the description in the Van Meter patent fairly implies that the apparatus is usable for jumping from the plane, regardless of the position of the user, and that he is free to operate the parachute after dropping from the plane.

With the Broadwick pack Smith had made jumps as early as 1914. Originally, at least, that pack was constructed to function only as an attached type. But, since the representative claims of Smith's first patent pertain more particularly to the pack or pack cover, the means by which the cover is to be held in place and the means by which the chute is to be released therefrom when its use is desired, regardless of whether the chute or pack is of the "free jump" or the attached type, and as the Broadwick pack was capable of being readily converted into the "free jump" type by one skilled in the art—one who had before him the packs of Bacque and Van Meter—it is of especial importance here. The Broadwick pack was worn on the back of the aviator. The cover consisted of two parts both of which were light and flexible. The top part consisted of a rectangular piece of light fabric fashioned at its corners in a manner to give to it a shape resembling a shallow box with flaring corners. To the center of this the peak of the parachute was attached by a very light break cord. The folded canopy of the parachute was placed in the top piece and there held by three light break cords running across it and through eyelets on the opposite edges of the top piece. The base or that part of the cover attached to the harness was cut more or less in the shape or form of the Greek cross but with each of its eight corners diagonally cut away. Upon this the shrouds, having their several layers separated by paper to prevent entangling, were placed, and upon the shrouds of the canopy lightly bound into the top piece. The arms of the cross were then folded as flaps over and about the lower part of the top piece and there held in place by light break cords connecting the adjoining edges of the flaps and by a like cord running across the middle of the top piece and tied to the opposite sides of the base or lower part of the two piece cover. To open the pack four short cords were attached to the top piece, one near the midpoint of each of the four radial lines running from the center to the corners of the top piece. These lines passed beneath, then over, the break cords holding the flaps of the base part together and were then all made fast to a rather long cord attached to the aircraft. When the aviator jumped from the craft and this cord was made taut by his descent, the break cord passing over the middle of the top of the pack and those holding the flaps of the base part together were broken and the shrouds allowed to drop out of the pack. As the shrouds became taut, the break cords binding the canopy to the top piece were broken, and when the parachute was fully extended, the

break cord by which the peak of the chute was attached to the top piece was likewise broken. Suspending members projected from the pack to connect the harness and parachute. It was frequently used. Since Bacque had disclosed a "free jump" pack in which the parachute was fully and freely exposed to the air by the simple expedient of removing the top part of the two-piece inclosing or withholding means, it is obvious that the conversion of the Broadwick pack into a "free jump" pack by the elimination of the break cords binding the canopy to the top piece and by bringing the unattached end of the pull cord to the aviator's belt or chest harness as in Bacque or Van Meter, instead of attaching it to the aircraft, was the work for a tyro, not an inventor. In fact, Mrs. Tiny Broadwick Brown testified that she had several times successfully used the Broadwick pack so altered as a "free jump" pack prior to 1916. But her testimony is uncorroborated and somewhat conflicting. Though quite possibly true, it is hardly sufficient to support a finding that the pack was actually so altered or used prior to Smith's earliest date. That finding, however, though of importance upon the issue of novelty, is of but little, if any, significance upon the questions of invention and scope of Smith's claims. Consequently, to find the gist of the invention, if any, of the claims, we must make inquiry beyond the fact that they include a "free jump" pack and one with a flexible cover. In this more remote field we find that while Broadwick used a two piece cover, Smith employed but a single sheet and made use of his pull cords or releasing means for "drawing back portions of the sheet." Van Meter and Broadwick pulled or cast away the top part of the two piece cover from the plate or base part of the cover. The same was, in effect, true in Bacque. It follows, I think, that the essence of the claims in suit resides in the employment of a single sheet and of releasing means that so function as to draw back portions of the sheet instead of wholly removing the top part of a two piece cover. Neither the Broadwick pack nor the Bacque patent was cited by the patent office against the Smith application. The Van Meter patent was referred to, but it was apparently deemed by the examiner, though erroneously, to disclose an attached type of chute only. Moreover, the form of pack shown in the first Smith patent never went into use at all. But in Floyd Smith Aerial Equip. Co. v. Irving Air Chute Co. (D. C.) 276 F. 834, Judge Hazel held, though without having had a full explanation of the Broadwick pack, the claims valid, and I am not now disposed to make a contrary finding, though I am inclined to think the field pre-empted by the claims here in suit a very narrow and restricted one.

Defendant's pack is of the "free jump" type, though it may be used also as an attached type. Its cover is of two parts. Its base is rectangular, stiff, and inflexible, while the top piece is cruciform, but having a double rectangular piece of fabric between its arms, and flexible. Conical, metal buttons having a hole through which a wire pin may pass are mounted on the under side of the base near its edges. The flexible top piece is provided near the edge of its flaps with eyelets. The edges or margins of the flaps of the top piece containing the eyelets pass to the under side of the base. The eyelets are there placed over the conical buttons and fastened in place by wire pins put into the holes in the buttons. The pins are mounted upon two pull cords which pass to and join at a pull ring held in place by a pocket on the harness on the aviator's chest. A webbing whose lower end is attached to the lower edge of the top piece passes under the top piece and has its upper end made fast to the pull cord at the upper end of the pack. When the jumper pulls the cord, he not only removes the pins from the buttons, but also manually removes the top piece wholly from the pack. Necessarily, suspending members, connecting the chute and harness, project or extend from the pack. The top piece is provided at its corners with small flaps to cover the several buttons and pins when the top piece is in place. One end of the flap is sewed to the top piece. The free ends are detachably connected thereto by means of a spring eyelet or grommet, in each of the several flaps, which engages a metal cone mounted on the top piece.

So far as the pack of Smith's first patent is concerned, Smith moved in one direction from the prior art and the defendant in another. Smith took the flexible base of the Broadwick pack, enlarged it to enable it to cover the entire chute, and then provided means to retain the chute within and release it when desired from the cover of his design. He discarded entirely Broadwick's top piece. The defendant, on the other hand, took the stiff base plate of the prior art, improved upon it, combined it with the flexible top piece, enlarged, of Broadwick or Bacque, and provided means for completely removing the top piece, manually, from the pack when desired. In so doing, I think, defendant kept wholly outside of the domain of the first patent.

In his second patent Smith again used a single sheet of flexible material for his cover, but he caused the flaps to overlap instead of merely meeting edge to edge. He mounted cone-shaped, metal buttons on one or more of the overlapping flaps, put metal eyelets in the others, placed the eyelets over the buttons, and held the eyelets, and, consequently, the flaps, in place by wire pins, mounted on a single pull cord, passed through holes in the buttons. These claims are relied upon as typical:

"1. A parachute pack adapted to hold a folded parachute, embodying a sheet of flexible material with flaps adapted to be folded about the parachute, means for connecting said pack to the body of a rider, releasable means for holding the edges of the flaps together, and a pull cord extending from said releasable means to a point convenient to be operated by the rider."

"18. The combination with a parachute folded into a compact mass, of a flexible sheet comprising a body portion approximately rectangular in shape and flaps at the four edges, said sheet being folded about the parachute with the flaps overlapping each other on one side of the pack, a plurality of releasable fastening means for holding said flaps together and producing a tight closure, and a pull cord connected with said fastening means to release the same."

Fundamentally the pack of these claims is the pack of the first patent. The advance made by the second patent over the first is found in the improvement in the means for retaining and releasing the chute when inclosed in a cover consisting of a single sheet. Since the defendant does not use a single sheet of flexible material or a single pull cord, it does not infringe.

Plaintiff, however, stresses the fact that plaintiffs' packs were the first packs of the "free jump" type to go into use, that they have now gone into wide general use in many countries, and that Smith's efforts in producing his pack were the result of cries of distress arising from the Allies during the late war by reason of a want of a pack suitable for use in high speed planes. But, if that be the fact, it cannot change the further facts that Smith built upon the prior art and that he proceeded from that art in one direction, while the defendant moved forward from that art in another direction. Moreover, the successful pack of the plaintiffs is not the pack of the claims, but the pack of numerous other claims of these and numerous other patents.

Again, the defendant relies upon the Steven's pack as a complete anticipation of the claims in suit of both the first and second patents. Stevens could not be found to be produced as a witness, so the testimony given by him in the case before Judge Hazel reported in 27 F.(2d) 170 was offered as evidence in this case. The Floyd Smith Aerial Equipment Company, one of the plaintiffs here, was not a party to that suit. Consequently, I think the evidence given by him in that case should not be admitted here over the objection made by that company. In view of the fact that I find no infringement even if the claims in suit of the first and second patents are valid, I think it unnecessary to determine whether anticipation can be made out from the admitted evidence with respect to the Steven's pack.

The third patent in suit has to do with flaps covering the metal cones, eyelets, and pins. These add to the appearance of the pack, and the testimony is that they also serve in a measure to protect the pins and prevent their being bent or inadvertently pushed from the buttons. The claims relied upon are:

"5. A container or cover for a parachute having closing flaps, one of said flaps having at the end thereof an auxiliary flap, and means for detachably connecting the free end of the auxiliary flap to the flap with which the auxiliary flap is associated."

"8. A container or cover for a parachute provided with a plurality of flaps adapted to be folded inwardly and overlap each other at their free ends, a row of detachable fastening means adapted to secure the overlapping ends of the flaps together, one of said flaps having a guard flap attached thereto in position to be folded over said fastening means, and means for detachably holding said guard flap in the aforesaid position."

As hereinbefore set out when describing defendant's pack, the defendant makes use of flaps to cover the buttons and pins of its pack, but as defendant's cover is not made of one sheet, it does not make use of the guard flap called for by claim 8.

In claim 5 I can find nothing of an inventive quality. Fruit Growers' Express Co. v. Massie, 41 F.(2d) 43 (C. C. A. 3).

The bill of complaint must be dismissed.