**ENAMELED METALS CO. v. WESTERN CONDUIT CO. et al. (two cases).**

(Circuit Court of Appeals, Sixth Circuit. December 10, 1920.)

Nos. 3395, 3396.

1. **Patents ⬦328—950,341, for method of treating conduit pipes, void for lack of invention.**

   The Patterson patent, No. 950,341, for a method of treating metal pipes for use as conduits for electric wires, claim 1, *held* void for lack of invention in view of the prior art and also for prior public use.

2. **Patents ⬦328—1,120,731, for process of treating conduit pipes, void for lack of invention.**

   The McIlroy patent, No. 1,120,731, for a process of treating conduit pipes by providing a sleeve of paper or other fragile material for the threaded portion of the pipe and couplings to protect the threads during the enameling process and prevent their being filled with enamel, and the resulting product of such process, *held* void for lack of invention and for prior use.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Two suits by the Enameled Metals Company against the Western Conduit Company and the Youngstown Sheet & Tube Company. Decrees for defendants, and complainant appeals. Affirmed.

W. Clyde Jones, of Chicago, Ill. (James Negley Cooke, of Pittsburgh, Pa., on the brief), for appellant.

George E. Stebbins and Clarence P. Byrnes, both of Pittsburgh,

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Pa. (Geo. H. Parmelee, of Pittsburgh, Pa., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. On the 25th day of May, 1915, the appellants, as assignee of the inventor, John S. Patterson, filed a complaint in the United States District Court, Northern District of Ohio, Eastern Division, asking that defendant the Western Conduit Company be enjoined from further infringement of letters patent No. 950,341, issued to the inventor, Patterson, on February 22, 1910, and for damages for past infringement.

On the 5th of November, 1915, appellants filed a separate complaint in the same court to enjoin the Western Conduit Company from further infringement of letters patent No. 1,120,731, issued December 15, 1914, to complainant, as assignee of the inventor, McIlroy, and for damages.

Issues were joined by answer to each of these complaints, and, it appearing to the court that these patents related to the same art, it was ordered, pursuant to the stipulation of counsel, that these causes be consolidated. At the trial of the case it was conceded by stipulation that the Youngstown Sheet & Tube Company is the successor of the Western Conduit Company, that it has taken over the business and has continued the acts charged as infringement of these patents, and thereupon that company was added as a party defendant.

The trial court found from the evidence that claim 1 of the Patterson patent and all the claims of the McIlroy patent were invalid for lack of invention and lack of novelty, in view of the prior art and prior uses, and entered a decree dismissing both bills of complaint and for costs.

The complainant perfected a separate appeal to the decree finding the equities with defendant and dismissing both complaints, but a joint transcript of the record has been made up for both appeals, and they were heard and submitted together in this court.

[1] The Patterson patent relates to a method of treating metal pipes, and has special reference to such pipes as are used for electrical conduits. Claim 1 of that patent reads as follows:

"The method of treating metal pipes, which consists in removing the scale therefrom, threading an end of the same, and applying a coating to said pipe, including its threaded end."

Claim 2 of this patent is not involved in this controversy.

It appears from the evidence that, in preparing an ordinary commercial metal pipe for use as electrical conduit, it is necessary to remove all slag or scale, especially from the inner side of the pipe, so as not to tear or injure the insulation of the wires to be drawn through the same, and after this is done a coat of enamel is applied both inside and outside the pipe.

It is claimed that, prior to the invention of the patent in suit, the process in most general and successful use by the manufacturers of conduit was to purchase ordinary commercial pipe manufactured by the tube mills, in lengths of 10 feet and threaded at both ends. The

scale or slag attached to the inner and outer surfaces of this pipe was then detached or loosened by means of a chemical pickling bath, composed of a weak solution of sulphuric acid, in which bath a bundle of pipe was immersed vertically in a vat containing this pickling solution and allowed to remain there from two to five hours. In order to avoid burning they were withdrawn at frequent intervals, and the pipes which had been sufficiently treated were removed, and those requiring further treatment were returned to the vat. This process was continued until the slag or scale had all been detached or loosened, and a blast of air containing sand or other abrading material was then blown through the interior of the pipe to dislodge and drive out the scale and slag loosened or detached therefrom by the pickling process. Other methods than the air sand blast, such as tumbling barrel, drawing the pipe to smaller dimensions, the use of a ramrod, or the like, were also employed to remove the scale, after the pickling process. The pipe was then enameled, by dipping it in a tank containing an enameling fluid and then baking it in an oven.

It further appears from the evidence that there were at least two principal objections to this method of treatment. The first and most serious objection was that the sulphuric acid operated more quickly upon the fresh-threaded ends of the pipe than it did upon the uncut parts of its surface, thereby causing injury to the thread, so that when the pipe was put in place it was frequently necessary for the workmen to remove the threaded end and cut a new thread. The other objection was that the enamel so filled the threads that, before the pipe could be used, the threads had to be rechased with a die to clean the same, so as to secure good bonding when installed.

Claim 1 of the patent in suit relates solely to the first objection above stated, and this objection it sought to overcome by the use of unthreaded pipe, changing the order of treatment to pickling first, then threading, then enameling, instead of threading, pickling, and enameling.

It is admitted by the defendant that it is using the process described in claim 1 of the Patterson patent, but it denies that that claim has any validity whatever, for the reasons:

(1) Prior knowledge and use of the process of claim 1 in suit in this country before the alleged invention thereof by the patentee.

(2) Public use in this country of the process of claim 1 in suit by others more than two years prior to the filing of the application for the patent in suit.

(3) Claim 1 in suit is invalid, in view of the state of the art at the date of the alleged invention, since it claims merely an obvious factory expedient in selecting the sequence of the steps of cleaning, threading, and coating pipe.

Upon the issue so joined the District Court found that the evidence clearly established each of these defenses. There is practically no disputed question of law involved in this litigation.

It is insisted that claim 1 of this patent includes, as a distinguishing and essential element of the invention, a method for the removal of scale and slag, different from the method then in use. The descrip-

tion of the patent itself, as to method of cleaning, reads almost word for word on Garland, No. 611,900, issued October 4, 1898, and the evidence as to the prior use of this same method of cleaning, described by Patterson in his application for a patent, leaves no question of doubt whatever that it was in common use long prior to Patterson's purported invention.

The evidence discloses that the Youngstown Sheet & Tube Company is the successor of the Western Conduit Company, which company was the successor of the H. A. Peterson Manufacturing Company; that prior to 1906 Peterson was a contractor engaged in installing electrical equipment, and as such contractor experienced difficulties with acid-eaten threads in electrical conduit used by him in his business; that after due investigation of the cause responsible for these defective threads, and for the purpose of remedying the same, he undertook the manufacture of electrical conduit with "perfect and uniform threads," by securing from the tube mills unthreaded pipe, then cleaning the same with sulphuric acid and other well-known means, then enameling the pipe, and thereafter threading the ends and fitting the couplings. In January, 1906, he exhibited this electrical conduit, manufactured after this method, at an electrical exhibit in Chicago. A description of this exhibit appears in the next month's issue of the Electrocraft. Peterson at once started upon the construction of a factory for the purpose of manufacturing this conduit and his factory was open in September, 1906. Electrical conduit manufactured according to this process was placed upon the market not later than the 1st of December, 1906. The Peterson method differed from claim 1 of the Patterson patent, in that the enameling coat was applied before the pipe was threaded.

While Patterson's application for a patent was filed August 8, 1908, there is some conflict in the evidence in reference to the actual date of the claimed invention. He testifies that he first began to experiment with the unthreaded pipe in 1908, and that he made the invention of the Patterson process in that year. Later he testified that the proper date of his invention was in October or November, 1906. It does appear, however, that in April, 1908, the first commercial pipe was made by complainant in accordance with the Patterson process, while Peterson had made pipe according to his process, for the exhibit in Chicago, in January, 1906, and that his factory commenced actual operation in September of that year. Even if Patterson discovered his invention as early as October or November of 1906, Peterson was then engaged in making commercial conduit by a process that differed from claim 1 of the Patterson patent only in the fact that enameling preceded the threading, so that Peterson's process was clearly an anticipation of claim 1 of the Patterson patent, in so far as that claim required the pickling and cleaning of the pipe to precede the threading.

But Peterson was not the first to change the order of the well-known steps in the treatment of metal pipe for electrical conduit. As early as 1898 the Boston Electroduct Company manufactured electrical conduit exactly in the manner described in claim 1 of the Patterson process. This method was also followed by the Safety-Armorite Con-

duit Company in 1901, the American Circular Loom Company in 1902, and the Mark Manufacturing Company in April, 1906. It is insisted, however, that these manufacturers used methods of removing scale and slag other than the sand and air blast after, and in addition to, the pickling process. That is true, perhaps, as to some of them; nevertheless they all threaded the pipe after pickling.

It further appears from the evidence that some of these manufacturers used, after the pickling process, no other or further means of removing the scale and slag than the sand blast described in Patterson's patent. Yet, even if they did use other means, it is apparent that claim 1 of the Patterson patent does not relate to a method of removing scale from pipe, but, on the contrary, only to a change in the order of the use of well-known means of producing the finished product.

The claim that this use in the prior art was only in the nature of experiments that were finally abandoned is not sustained by the evidence. It is true, perhaps, that this method was not continuously employed by the various companies using the same; but that is fully explained by the fact that it was sometimes more advantageous, from an economic standpoint, to purchase the threaded pipe, even though there should be some loss occasioned in the pickling process, than to buy unthreaded pipe and thread after pickling.

It further appears from the evidence to have been the common practice of the manufacturers above named to reverse factory methods from time to time, whenever, in the exercise of good business judgment, the purchase of standard threaded pipe, or unthreaded pipe, or random length pipe, appeared to be advantageous from a factory standpoint.

The finding of the trial court that claim 1 of the Patterson patent is invalid because of prior knowledge and use, and public use for more than two years prior to the filing of the application for the patent in suit, is fully sustained by clear and convincing evidence.

To avoid the effect of this evidence as to anticipation and prior use, the appellant now proposes to file disclaimer limiting claim 1 to a process by which the scale and slag are completely loosened and removed by chemical treatment by submersion in a solution of acid, preferably sulphuric acid, so that the scale and slag can be dislodged and driven out by the air blast. Under the facts and circumstances of this particular case, it is at least doubtful whether the result sought can be accomplished by disclaimer, rather than by reissue, for the reason that it was Patterson's plain intent to make this claim cover the three-step process, with the steps in the order he specified, and without regard to whether the cleaning was by pickling, or by sand blast, or both, so there is no ground to claim that the patentee has made this claim too broad "through inadvertence, accident, or mistake." R. S. § 4917 (Comp. St. § 9462).

The method of loosening the slag and scale by dipping in a weak solution of sulphuric acid was old in the art when Patterson's application for patent was filed. Beyond question it was obvious to all persons using this method, as it is now obvious to appellant, that, if the pipe were permitted to remain in this sulphuric acid bath a sufficient length of time, it would loosen all the scale and slag adhering

to the interior of the pipe, so that it could readily be removed by the air blast alone. This, however, would injure the thread to such an extent that it was not practicable to permit the pipe to remain in the acid a sufficient length of time to loosen and remove the slag so thoroughly that no abrading material would be required in connection with the air blast; but when unthreaded pipe is used this difficulty wholly disappears. If there is anything of novelty in the Patterson patent, it is the use of unthreaded pipe and threading after the cleaning process, and the proposed disclaimer can in no way effect the validity or invalidity of claim 1 of the patent in suit. That claim covers only a change in the order of use of old and established methods; this clearly appears from the Patterson file wrapper and contents.

After all of the claims first contained in Patterson's application for a patent were rejected, "as devoid of invention, covering an obvious choice of well-known steps to produce the desired result," Patterson amended his claims, and in support of the amended claims made this statement:

"The essential feature of this method is to thread the pipe after cleaning by pickling or sand blasting."

We are of the opinion that this statement, made by Patterson to induce the Patent Office to allow his application for a patent, fully covers all that he claimed for his invention, and all that could possibly be considered as new or novel in the art. It is certainly obvious to a person of ordinary intelligence, regardless of whether or not he be engaged in the manufacture of electrical conduit, that if the acid bath necessary to loosen and remove the scale and slag from the inner surface of the pipe injures or destroys the thread, the remedy is by threading after, and not before, the cleaning process. Whether this latter method is one of economic advantage depends upon sound business judgment, based upon factory experience, and is not invention. It would therefore appear that the evidence also fully sustains, by the requisite degree of proof, the further finding of the District Court that claim 1 of the Patterson patent is, in view of the prior art, invalid for lack of invention.

[2] The McIlroy patent relates "to coated pipes and to the treatment of enameled coated pipes for use as electrical conduits for containing electric wires and other purposes," and the object of the purported invention is "to provide a protector for the exposed threads of the conduit coupling which will securely inclose the same, and which can be very quickly applied before coating, and can be very quickly removed when the conduit is finished, or at the point where the conduit is to be used," and also for the protecting sleeve over the threaded end of the pipe, so that the interior threads on the projecting end of the coupler and the exterior thread on the end of the pipe may be prevented from being filled up or choked with the enamel or coating fluid.

The description in the application calls for a sleeve formed of any suitable material, such as paper, linen, pulp, metal, wood, or cardboard; but in claims 1, 3, and 5 of the patent no reference is made to the material of which this sleeve is to be manufactured. In claims 2, 4, and 6 this sleeve is referred to as "a fragile protecting sleeve." The

original idea of McIlroy was to protect by this sleeve the interior threads of the couplings extending beyond the end of the pipe to which it was attached. Later, however, and while the application was pending, he extended his description and claims to include a protecting sleeve of similar material and manufacture for the protection of exterior thread on the end of the pipe to which no coupler is attached. The defendant is not using, and never has used, any sleeve for the protection of the interior thread of the couplings extending beyond the end of the pipe to which it is attached, but is using a protecting cardboard sleeve upon the exterior thread of the opposite end of the pipe to which the coupler is attached. It is therefore wholly immaterial, in the determination of the issues here presented, whether or not this internal-sleeve is new to the art. The several claims of this patent are:

(1) The process of treating a conduit unit having a threaded portion, consisting in the steps of applying a protecting sleeve to cover said threaded portion, and then applying a coating over said unit and said sleeve.

(2) The process of treating a conduit unit having a threaded portion, consisting in the steps of applying a fragile protecting sleeve to cover said threaded portion, and then applying a coating over said unit and said sleeve.

(3) The process of treating a conduit unit having an exteriorly threaded end, consisting in the steps of applying a protecting sleeve to cover said threaded end, and then applying a coating over said unit and said sleeve.

(4) The process of treating a conduit unit having an exteriorly threaded end, consisting in the steps of applying a fragile protecting sleeve to cover said threaded end, and then applying a coating over said unit and said sleeve.

(5) As a new article of manufacture, a conduit unit having a threaded portion, a protecting sleeve covering said threaded portion, and a protecting coating over said unit and sleeve.

(6) As a new article of manufacture, a conduit unit having a threaded portion, a fragile protecting sleeve covering said threaded portion, and a protecting coating over said unit and sleeve.

The defendant contends that all the claims of this patent are invalid, so far, at least, as they relate to the exterior sleeve, for the following reasons:

(1) Prior knowledge and use of the patent.

(2) Public use and sale in this country by others more than two years prior to the filing of the application for the patent in suit.

(3) Public use by the patentee, McIlroy, and his assignee, the plaintiff, more than two years prior to the filing of the McIlroy application.

(4) The patent is invalid, in view of the state of the art at the date of the alleged invention, since it claims merely an obvious factory method.

(5) Defendant, in its process complained of, has used only a process and sequence of steps which were old and well known at the date of the alleged invention of the patent in suit.

The truth or falsity of these defenses depends solely upon the facts

proven by the evidence in this case and involves no disputed question of law. In the patent art the defendants rely upon Loper, 222,920 and 628,408; Harlander, 418,644; Erickson, 712,514; Greenthaler, 811,-288; Patterson, 950,341.

Without discussing these patents in detail, it is sufficient to say that the trial court properly found that these patents, especially Loper, 222,920 and 628,408, anticipated McIlroy in all respects, except the use of protecting sleeves to prevent the threads from being filled up or choked with a coating fluid when the threaded pipe is subjected to the enamel bath. Patterson, 950,341, in describing the enameling process, specifically refers to the use of a protector "on one or both ends of the pipe."

The evidence is clear that the predecessor of the defendant used protectors identical with the protector in use under the McIlroy patent as early as 1909, long before McIlroy claims to have discovered this invention; that for purely business reasons it discontinued the use of these particular protectors, and used couplings in their stead for like purpose, on both ends of the pipe, during the enameling process. This involved considerable labor, and when the European war started, and wages advanced, it became necessary for this defendant to return to the use of paper ferrules or protectors, in order to cheapen the cost of production. It therefore does not appear that the Western Conduit Company, or its successor, abandoned the use of these ferrules as a discontinued invention, but rather because of the fact that conduit without these protectors was selling for as much money as the conduit upon which they were placed. However, just as soon as the market conditions changed, so that the use of these protectors would not be a total loss to the manufacturer, this defendant resumed the same method that its predecessor had used prior to the McIlroy patent.

The New York Transit Company also used a cap and plug upon its pipe and coupling for the purpose of protecting the threads from the parolite coating operation as early as 1910.

The American Circular Loom Company used a similar method of keeping its thread clean as early as 1902. There is some evidence, however, that the iron coupling used by the American Circular Loom Company does not keep the threads as clean of enamel as paper protectors. However, that company has been using this process for a great number of years without experiencing any factory or commercial difficulties, and the testimony of Patterson and of McIlroy would indicate that, from their experience in doing their work in this way, the iron coupling is a successful method of keeping the threads of the conduit substantially free from enamel.

The Safety-Armorite Conduit Company also protected the threads of its conduit bends in like manner as early as 1901. It is still using this method. It further appears from the testimony of Schweinsberg that the process employed by the Safety-Armorite Conduit Company during all these years consisted of first pickling the pipe and then threading it, in a manner identical to the process to which appellant's disclaimer attempts to limit the claims in the McIlroy patent. This company also used paper protectors in its West Pittsburgh factory to

keep the threads free from enamel, as early as 1905. These protectors were used openly on pipe going through the regular factory process. Pettengill testified that during the time he was superintendent of this factory he personally used these paper protectors and observed the result. The witness Schweinsberg, who was employed at the West Pittsburgh plant of the Safety-Armorite Company from 1905 to 1908, and during the time paper protectors were used in that factory, entered the employ of the Western Conduit Company as superintendent January 1, 1909. He was familiar with the use of paper protectors in the Armorite factory, as testified by Pettengill, and it was while he was superintendent of the Western Conduit Company's factory that 5,000 of these paper protectors, substantially identical with the McIlroy protector, were purchased and used by that company.

The Clifton Manufacturing Company as early as July, 1911, used half couplings over the threaded ends of pipe, and then pickled and enameled and shipped the pipe with these thread protectors attached. This company also used brass unthreaded sleeves and wire thread protectors, which came on shipments of pipe, for the same purpose as the half coupling.

The Sprague Electric Company, about 1900, manufactured about 10,000 feet of conduit, using paper sleeves to protect the thread from the enamel bath. These sleeves were used openly in the factory in the presence of all the workmen. The appellant used at least 3,000 half couplings, or short couplings, and wire protectors, for the purpose of protecting the threaded end of the pipe from the enameling bath, as early as in June, 1908. McIlroy testifies that there was no secret in the use of the half couplings or wire protectors in the appellant's factory, and that the conduit upon which they were used was sold along with the usual commercial run of conduit. He further testified that these metal thread protectors were not satisfactory, although they were a great improvement "over using nothing at all," but that they were not as good as the Patterson process of enameling, threading and enameling after the pickling and cleaning operation. However, the public use of half couplings and wire thread protectors by the plaintiff as early as 1908 covers the process step by step to which the disclaimer would limit the claims of the McIlroy patent, and this was more than two years prior to the time McIlroy claims to have invented the process and the use of the paper protectors in connection with that process.

It is therefore apparent, not only that metal caps, couplings, and wire protectors were in public use for the purpose of protecting the thread of conduit and other kinds of pipe from the enameling or other coating process more than two years prior to the time of the filing of McIlroy's application for a patent, but also that paper protectors had been known and used commercially, at least on the exterior thread on the end of the pipe, not only for two years, but for many years, prior thereto.

The appellant proffers a disclaimer, the effect of which is:

"To limit claims 1, 2, 3, and 4 to a process, and claims 5 and 6 to a product, in which the conduit unit having a threaded portion is made by removing the

scale and slag by chemical treatment prior to the threading of the pipe, and in which the protecting sleeve has a substantially smooth and unthreaded surface, which will fit closely or snugly over the threaded end, but loose enough to allow sufficient or a small amount of enamel to reach the threads to form a thin, rust-preventing coating not sufficiently thick to require rechasing of the threads."

It is apparent, however, that this proposed disclaimer would amount to a virtual restatement of the claims of the patent. While McIlroy does state the usual practice with reference to the removal of the slag or scale and the threading of the pipe afterwards, substantially as in Patterson, nevertheless McIlroy's patent relates solely to a protecting sleeve to cover the threaded portions of the pipe and couplings before the enamel coating is applied. The process by which the pipe is prepared to receive this enamel coating is wholly unimportant in so far as the McIlroy invention, or claimed invention, is concerned. It will operate for the purposes described in the application, regardless of whether the pipe is threaded before or after the pickling process. In other words, the declared object and purpose of this invention is to protect the threaded ends of the pipe and the interior threads of the couplings from being filled up or choked from the enameling fluid. The validity of the claims in this patent cannot and does not depend upon the manner in which the pipe is prepared to receive this enamel bath. If this patent were intended to cover a process for the preparation of pipe to receive the enamel coating by first removing the scale and slag by an acid bath, followed by a sand blast, and then threading the pipe, it is sufficient to say that to that extent it would be anticipated by Patterson, and also by the public knowledge and prior use of that method as stated in the foregoing portions of this opinion relating to the Patterson patent. It is also true that, in view of the evidence relating to the prior art, it is wholly immaterial whether the claims in this patent be limited to a process or a product in which the conduit unit having the threaded portion be made by removing the scale and slag by chemical treatment prior to the threading of the pipe.

Nor can this disclaimer be permitted to limit the claims to an unthreaded sleeve which will fit closely or snugly over the threaded end, but loose enough to allow sufficient or a small amount of enamel to reach the threads to form a thin, rust-preventive coating, not sufficiently thick to require rechasing of the threads. In the disclosure in the application for this patent it is stated that, "if desired, the sleeve can be made loose enough to allow sufficient or a small amount of enamel to reach the threads in the projecting portion of the coupling to prevent their rusting"; but there is nothing in the claims or in the disclosure in reference to a threaded or unthreaded sleeve. The claims cover all sleeves, threaded or unthreaded, loose or close-fitting, so that it is evident that this application was made and allowed upon the theory that a protecting sleeve, of the kind described in the application and claims, involved invention, and not upon any theory that the invention consisted in a loose or unthreaded sleeve.

The court is not now at liberty to usurp the functions of the Patent Office, and by forced construction, with the aid of the proposed disclaimer, issue in effect a new patent, limiting the claimed invention to a particular kind of sleeve, notwithstanding the essential element of the

claimed invention consisted wholly in protecting the threads of the conduit by any "fragile" sleeve suitable for that purpose. Kellogg Switch Board & Supply Co. v. Dean Electric Co., 257 Fed. 425–428, 168 C. C. A. 465 (C. C. A. 6).

Even though this disclaimer might affect the question of anticipation and prior use, it is clear that the McIlroy process is not invention. It is no more than an obvious factory expedient to accomplish the desired result. The object desired was to keep the threads clean from the enameling substance. To do this required that they should be covered during the enameling process. If it was desirable that some of the enameling substance should enter into the thread, then the protective covering must be attached more loosely to the pipe than if the object desired was to exclude entirely all enamel or other coating substance from the thread. The history of this business, as detailed by the testimony of witnesses experienced and expert in the manufacture of conduit pipe, shows that it was not the exception, but the rule, to protect the threads during the enameling process. The use of couplings, half couplings, wire thread protectors, brass or paper protectors, was wholly a matter of choice, based upon economic reasons, factory experience, and good business judgment. The use of all of these forms of caps and coverings was known and available to all manufacturers of this or similar products for a period long exceeding two years prior to the filing of the application by McIlroy for this patent.

For the reasons above stated, the decree of the District Court, holding claim 1 of the Patterson patent and all the claims of the McIlroy patent invalid for lack of invention and lack of novelty, in view of prior knowledge and prior usage, is affirmed.