## CORN PRODUCTS REFINING CO. v. PENICK & FORD, Limited, Inc.

### No. 4691.

Circuit Court of Appeals, Seventh Circuit.

Dec. 6, 1932.

Rehearing Denied Feb. 28, 1933.

Percival H. Truman, of Chicago, Ill., and Melville Church, of Washington, D. C., for appellant.

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill. (John H. Lee, Russell Wiles, and Horace Dawson, all of Chicago, Ill., and O. N. Elliott, of Cedar Rapids, Iowa, of counsel), for appellee.

Before EVANS and SPARKS, Circuit Judges, and WILKERSON, District Judge.

WILKERSON, District Judge.

Plaintiff (appellee here) charged infringement of Widmer patent, No. 1,585,452, for the manufacture of starch. Defendant by counterclaim charged infringement of McCoy patent, No. 1,651,611, for a closed or "bottled-up" wet starch system. The District Court found infringement of claims 1, 2, 4, 5, 8, 9, 13, 14, and 18 of the Widmer patent and dismissed the counterclaim on the issue of validity.

The patents in suit are in the field of starch manufacture by the wet method. By this method starch-bearing material, such as corn, after being ground, is subjected to operations in water to separate the starch therefrom. Both patents deal with the repeated return to the system and the re-use of the water employed in the separating and subsequent starch washing operations, with the object of preventing stream pollution, economizing water and saving solubles and insolubles in the water which would be wasted by going to the sewer with the water—the ordinary objects sought to be achieved in any manufacturing system involving the repeated use of process waters.

The principal constituents of corn are: Starch, gluten—soluble and insoluble—germs, bran and fiber (slops) together with certain salts and other soluble substances. The corn is first softened by steeping in water which leaches out soluble substances and the steeped water is evaporated to save these substances. The steeped corn is then ground and the starch separated from the other constituents of the corn in separating operations in water. The waste water from the separating operations is called gluten water because it is taken from the gluten settlers when the gluten is recovered. The starch is washed with fresh water and the filtrate or wash water from this operation is called starch wash water. The patents in suit deal with the re-use of these waters.

By the old practice the corn is first steeped in the steeps and the water drawn off to the evaporator. The steeped corn then goes to the wet starch house where the germs, bran, and fiber are removed by means of separating operations carried on in water, giving a mixture of starch and gluten which is then caused to flow over "tables" which are long, slightly inclined troughs, upon which the starch settles; the gluten and water flowing over the ends of the tables into gluten settlers. The gluten settles to the bottom of the settlers and is removed. The starch is removed from the tables and goes to a filter where it is washed with fresh water to remove soluble substances. It was also ordinary practice to return from 10 to 20 per cent. of the gluten water to the steeps, thus saving some of the soluble substances. The remainder of the gluten and starch wash water went into the sewer. Another feature of the old process was the use of sulphur dioxide throughout the system. Corn in a wet state ferments and decomposes. It was customary to use sulphur dioxide in the steeps and in the wet starch house, and in fact throughout the system, to prevent fermentation and especially to prevent a sliming fermentation which, if it occurred, would upset the process. It was also customary to keep the temperatures of the liquids passing through the wet starch house higher than ordinary room tempera-

tures, the temperatures in the starch house being frequently maintained as high as 125° Fahrenheit.

*The Widmer Patent.*—The Widmer specification states that in accordance with the improvement covered by the patent the gluten water heretofore discharged into the sewer is returned to the process and used where it has been customary to use fresh water, for example, in the coarse and fine slop separations or in the washing of the germ; that in order to prevent the gluten waters from sliming the starch-bearing material undergoing separation and the reels or sieves used in such operations these waters "before being returned to the process are sterilized so as to prevent or at least to arrest fermentation and decomposition"; that preferably the sterilization is brought about by heating the gluten overflow water (although other methods might be employed); and that the return of the gluten overflow water to the process results in the starch on the starch tables having a higher soluble content, which is remedied by thoroughly washing the starch, for example, by filter pressing.

In the drawing which exemplifies the invention the gluten overflow water is taken through a pipe to a collecting tank and from the tank to a sterilizer connected at the bottom with a cooler from which the water is run to the wet starch house. As to the operation of the sterilizer and cooler it is said: "The control condenser * * * operates to maintain a proper vacuum in the evaporator. The vacuum is adjusted so that the vapor will be sufficiently hot to give the gluten water flowing through the sterilizer * * * the proper temperature. This temperature is preferably about 160° Fahrenheit. By raising the gluten water to this temperature fermentation, which ordinarily sets in very quickly, is arrested so that no appreciable decomposition will take place for two or three days. As the gluten water will pass through the process in less than one day an ample margin of safety is provided. The sterilized gluten water passes from the sterilizer * * * to a collecting vessel. * * * The gluten overflow water cooled, for example to 90° Fahrenheit in the cooler * * * is run to the collecting vessel * * * and from thence to the wet starch house. * * * A certain amount of the water from the gluten settler * * * from ten to twenty per cent, for example, will pass * * * to the steep house where after being sulphurized it is used in steeping fresh grain. * * * The gluten overflow water contains a certain quantity of sulphur dioxide from the use of this acid during the starch separating operations. This sulphur compound, instead of being wasted, is returned to the process and re-used, effecting a saving of two-thirds in the quantity of sulphur required. * * * The utilization of the vapors from the evaporator for sterilizing the gluten water and the cooling of the sterilized gluten water by heat transference to fresh water utilized in the process at places where warm water can be employed advantageously, make it possible to effect the purposes of my invention at a cost which is relatively small. * * *"

It seems perfectly clear from the specification that the sterilization of the gluten water which Widmer says is essential to a re-use of that water in the separating operations is something additional to the treatment which the gluten water and the other liquids have received and will receive in the wet starch house. That is to say, it was Widmer's conception that the sulphur dioxide and process temperatures of the old method would be insufficient to prevent fermentation and decomposition and the resulting sliming if the gluten water were returned to the system; although they were sufficient when the wet starch house was supplied with fresh water.

In each of the claims [1] in issue here the

[1] "1. Improved method of manufacturing starch which comprises subjecting the starch bearing material in water to separating operations for removing the starch therefrom, sterilizing the water after use in these operations, and using the same in similar operations on subsequently treated starch bearing material.

"2. Improved method of manufacturing starch which comprises subjecting the starch bearing material in water to separating operations for removing the starch therefrom, heating the water after use in these operations to sterilize it, and using the same in similar operations on subsequently treated starch bearing material."

"4. Improved method of manufacturing starch which comprises subjecting the starch bearing material in water to separating operations for removing the starch therefrom, sterilizing the water after use in these operations, using the same in similar operations on subsequently treated starch bearing material, and washing the starch to remove excess of soluble substances.

"5. Improved method of manufacturing starch which comprises subjecting the starch bearing material in water to separating operations for removing the starch therefrom, sterilizing the water after use in these operations, using the same in similar operations on subsequently treated starch bearing material, washing the starch to remove excess of soluble substances, and utilizing the wash water in the aforesaid separating operations on subsequently treated material."

"8. Improved method of manufacturing starch from corn which comprises subjecting the grain in disintegrated condition and in water to a series of separating operations for obtaining therefrom, separately, the starch, the gluten, and the other ingredients of the grain, removing the water so used from the gluten, sterilizing this water and using the same for separating operations, as aforesaid, on subsequently treated grain.

sterilization of the gluten water is specified explicitly as one of the steps of the process. In none of the claims is the combination of process steps described by Widmer in the specification fully set forth.

 *The Widmer Disclaimer.*—After the trial in the District Court plaintiff attempted to reconstruct the claims of the patent by filing a disclaimer; and before taking up the issues of infringement the effect of this disclaimer [2] should be considered.

The disclaimer was filed under sections 65 and 71, title 35 U. S. C., 35 USCA §§ 65, 71 (R. S. §§ 4917, 4922; sections 7 and 9 of the Act of March 3, 1837, 5 Stat. 193, chap. 45).[3]

The first of these sections provides in substance that whenever through inadvertence, accident, or mistake and without any fraudulent or deceptive intention, a patentee has claimed more than that of which he was the original or first inventor or discoverer, he may be permitted to make disclaimer of such

---

"9. Improved method of manufacturing starch from corn which comprises subjecting the grain in disintegrated condition and in water to a series of separating operations for obtaining therefrom, separately, the starch, the gluten and the other ingredients of the grain, and sterilizing it, washing the starch and utilizing said sterilized gluten water and the wash water from the starch washing operation in separating operations as aforesaid on subsequently treated grain."

"13. Improved method of manufacturing starch comprising subjecting successive batches of the starch bearing material to separating operations in water, and sterilizing the water used for the treatment of each batch and using the same for the succeeding batch."

"14. Improved method of manufacturing starch comprising subjecting successive batches of the starch bearing material to separating operations in water, employing a portion of the water used in the separating operations on one batch of material for steeping a succeeding batch of the material, and sterilizing the remaining portion of said water and using it for separating operations on a subsequently treated batch of material."

"18. A process of separating and recovering solubles from starch bearing materials containing the same, comprising mixing such materials with water, thereby dissolving the solubles of the material in the water, separating the water containing the solubles, sterilizing the water, and again using it for treating the same or other bodies of like starch bearing materials, and recovering the solubles from the water in which they have been so concentrated."

[2] "Disclaims from claims 1, 2, 4, 5, 8, 13, and 18 all processes, excepting those for manufacturing starch from corn in a system wherein the solubles formerly permitted to run to waste and the waters separated from insolubles are recovered, and wherein, in the separating operations, starch and gluten are washed from bran in a sieve system which includes sieves having minute openings, and wherein starch, gluten, and water are separated from each other at a stage following the bran-washing operation, and wherein the separated starch is washed and wash water and solubles therefrom are included in the recovery.

"Further disclaims from claim 1 all processes, which do not include steeping the corn in a portion of the water which has been separated from starch and gluten subsequent to a starch tabling operation, and withdrawal of steep water and recovery of solubles therein, and the reuse of another portion of such water, in connection with necessary make-up water, in effecting separations preceding the starch tabling operation, and which do not include also washing the starch after separation thereof and reusing the wash water as make-up water.

"Further disclaims from claim 4 all processes which do not include the re-use of starch wash water as make-up water and introduction of SO₂ into the separating system through the medium of said wash water.

"Further disclaims from claim 8 all processes which do not include, as a part of the separating operations, the separation of germs from other insoluble corn constituents prior to the bran-washing operation, and which do not include steeping the

corn in a minor portion of the separated water and reusing a major portion of the separated water and starch wash water, as make-up water, in separating operations preceding the step of separating starch, gluten, and water from each other.

"Disclaims from claim 14, all processes which do not pertain to the manufacture of starch from grains having as constituents substantial amounts of bran and gluten constituting portions of the materials subjected to separating operations.

"Further disclaims from claim 18 all processes which do not include, as a part of the separating operations, separation of germs from insoluble corn constituents prior to the bran-washing operation and which do not include, as a part of the operations of recovering solubles, the withdrawal of steep water and recovery of solubles therein."

[3] "§ 65. *Disclaimer.* Whenever, through inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, a patentee has claimed more than that of which he was the original or first inventor or discoverer, his patent shall be valid for all that part which is truly and justly his own, provided the same is a material or substantial part of the thing patented; and any such patentee, his heirs or assigns, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer* of such parts of the thing patented as he shall not choose to claim or to hold by virtue of the patent or assignment, stating therein the extent of his interest in such patent. Such disclaimor* shall be in writing, attested by one or more witnesses, and recorded in the Patent Office; and it shall thereafter be considered as part of the original specification to the extent of the interest possessed by the claimant and by those claiming under him after the record thereof. But no such disclaimer shall affect any action pending at the time of its being filed, except so far as may relate to the question of unreasonable neglect or delay in filing it. (R. S. § 4917.) * 'disclaimor' should be 'disclaimer.' "

"§ 71. *Suit for infringement where specification too broad.* Whenever, through inadvertence, accident, or mistake, and without any willful default or intent to defraud or mislead the public, a patentee has, in his specification, claimed to be the original and first inventor or discoverer of any material or substantial part of the thing patented, of which he was not the original and first inventor or discoverer, every such patentee, his executors, administrators, and assigns, whether of the whole or any sectional interest in the patent, may maintain a suit at law or in equity, for the infringement of any part thereof, which was bona fide his own, if it is a material and substantial part of the thing patented, and definitely distinguishable from the parts claimed without right, notwithstanding the specifications may embrace more than that of which the patentee was the first inventor or discoverer. But in every such case in which a judgment or decree shall be rendered for the plaintiff no costs shall be recovered unless the proper disclaimer has been entered at the Patent Office before the commencement of the suit. But no patentee shall be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer. (R. S. § 4922.)"

parts of the thing patented as he shall not choose to claim or hold by virtue of his patent. The other permits the patentee to maintain a suit on his patent, although through inadvertence, accident, or mistake and without any willful default or intention to mislead the public, he has claimed some material or substantial part as an invention of which he was not the original or first inventor. He is deprived, however, of the right to recover costs, unless he has filed a proper disclaimer before the commencement of his suit. It is further provided that the patentee shall not be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer.

Passing the questions of delay in filing and of the effect of the disclaimer as an admission of the invalidity of the original claims, we are of the opinion that the document here in question is not a valid disclaimer. The statute limits the amendment of claims through disclaimer to that which "is a material and substantial part of a thing patented and definitely distinguishable from the parts claimed without right." The Supreme Court, in Hailes v. Albany Stove Co., 123 U. S. 582, 587, 8 S. Ct. 262, 265, 31 L. Ed. 284, construed the statute: "A disclaimer is usually and properly employed for the surrender of a separate claim in a patent, or some other distinct and separable matter, which can be exscinded without mutilating or changing what is left standing. Perhaps it may be used to limit a claim to a particular class of objects, or even to change the form of a claim which is too broad in its terms; but certainly it cannot be used to change the character of the invention. And if it requires an amended specification or supplemental description to make an altered claim intelligible or relevant, while it may possibly present a case for a surrender, and reissue, it is clearly not adapted to a disclaimer. A man cannot, by merely filing a paper drawn up by his solicitor, make to himself a new patent, or one for a different invention from that which he has described in his specification." Before a part of a patent is disclaimed it must first be claimed and it must be definitely distinguishable from the parts which the patentee is entitled to retain. There is a clear distinction between disclaiming a part separated in the patent itself as opposed to something comprehended in the general language. Grasselli Chemical Co. v. National Aniline & Chemical Co., Inc. (C. C. A.) 26 F.(2d) 305; Strause Gas Iron Co. v. William M. Crane Co. (C. C. A.) 235 F. 126.

The Supreme Court cases on which plaintiff relies are Silsby v. Foote, 14 How. (55 U. S.) 218, 14 L. Ed. 394; Smith v. Nichols, 21 Wall. (88 U. S.) 112, 22 L. Ed. 566; Dunbar v. Meyers, 94 U. S. 187, 24 L. Ed. 34; Hurlbut v. Schillinger, 130 U. S. 456, 9 S. Ct. 584, 32 L. Ed. 1011; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Minerals Separation v. Butte & Superior Mining Co., 250 U. S. 336, 39 S. Ct. 496, 63 L. Ed. 1019; Thropp's Sons Co. v. Seiberling, 264 U. S. 320, 44 S. Ct. 346, 350, 68 L. Ed. 708; Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868. In Silsby v. Foote the question here under consideration was not directly involved. The point which the court decided related to the statement in the disclaimer as to the extent of the interest of the petitioner. In Smith v. Nichols, the question was as to the time of the filing of the disclaimer; but, admitting the disclaimer, the patent was held invalid. In Dunbar v. Meyers the disclaimer was sustained to the detriment of the patent. In a machine for sawing lumber the claim included as an element "deflecting plates, one or both, etc." The disclaimer struck out the words "one or" and amended the specification by striking out corresponding portions. In Hurlbut v. Schillinger and Carnegie Steel Co. v. Cambria Iron Co., in which disclaimers were sustained, the disclaimer specifically struck out language in the specification reference to which in the claims made them too broad. In Minerals Separation v. Butte & Superior Mining Co. certain claims contained as a part the use of "a small quantity of oil." The disclaimer eliminated from those claims "any process of concentrating powdered ores, excepting where the results obtained are the results obtained by the use of oil in a quantity amounting to a fraction of one per cent. of the ore." The disclaimer was attacked on the ground that it is evasive and while sustaining the disclaimer the Supreme Court characterized even that language as bordering "on finesse." In Thropp's Sons Co. v. Seiberling combination claims were disclaimed except when the parts were constructed and co-ordinated in a certain way. The disclaimers were attacked on the ground that they exceeded the legal function of the disclaimer. The Circuit Court of Appeals for the Sixth Circuit had held the claims invalid even when patched up by the disclaimer. The Supreme Court said: "We do not find it necessary to pass upon the validity of the method of making disclaimers here pursued, because we agree with the Sixth Circuit Court in failing

to find invention. * * *" In Holland Furniture Co. v. Perkins Glue Co., the court did not pass upon the validity of the disclaimer, but assuming that it was valid and had the effect claimed, held the patent invalid.

The extent to which the device of altering claims by disclaimer is carried in this case will be seen when we undertake to rewrite the claims by interpolating limitations in the parts which must remain if the claims are to survive. Claim 1 so rewritten is as follows: "1. Improved method of manufacturing starch *from corn, in a system wherein the solubles formerly permitted to run to waste and the water separated from insolubles are recovered* which comprises subjecting the starch bearing material in water to separating operations for removing starch therefrom, *wherein starch and gluten are washed from bran in a sieve system which includes sieves having minute openings and wherein starch, gluten and water are separated from each other at a stage following the bran washing operation and wherein the separated starch is washed and wash water and solubles therefrom are included in the recovery, steeping the corn in a portion of the water which has been separated from the starch and gluten subsequent to a tabling operation, withdrawing the steep water and recovering the solubles therein,* sterilizing *another portion of* the water *separated from the starch and gluten,* after use in these operations, using the same in similar operations on subsequently treated starch bearing material *in connection with the necessary make-up water in effecting separations preceding the starch tabling operation, washing the starch after separation thereof and re-using the wash water as make-up water.*" (The portions in italics represent the additions through the disclaimer—matters which it is asserted were left out of the claim by inadvertence, accident or mistake.) If an attempt is made to rewrite claim 18 to conform to the disclaimer, it will be found that sentences cannot be constructed to combine the original claim and the disclaimer.

The statute (R. S. § 4888, 35 USCA § 33) requires that a patentee shall particularly point out and particularly claim the part, improvement, or combination which he claims as his invention. The claim prescribed by the statute is for the very purpose of making the patentee define precisely what his invention is. The disclaimers here make the claims so indefinite, obscure, and ambiguous that they do not stand the statutory test. To sustain the disclaimer in this case will require us to go farther than any court [4] has ever gone and to sanction a method of indirect amendment which nullifies the purpose of the statute. Moreover, the disclaimer does not strike anything from the specification and the claims as modified by the disclaimer retain sterilization as a distinct step in the process. In that respect the claims as modified by the disclaimer do not differ from the original claims.

*Alleged Infringement of Widmer Claims.*—Plaintiff urges that even if the disclaimer is rejected the original claims must be held to cover broadly a completely "bottled-up" corn starch factory; that is, a factory in which all of the gluten and wash waters are returned and re-used in the separating and washing operations of the system. This construction, it is urged, is required by the express language of the claims, or at any rate by a fair application of the doctrine of equivalents.

It is true that in some of the claims (e. g. claim 1) the step is described as "sterilizing the water after use in these operations." It is said that this is broad enough to include the customary sulphurization in the wet starch house after the gluten water is returned to the operations. The claims, however, must be read in the light of the specification. A patentee may write his own dictionary and have the benefit of his own definition of a term used, but, conversely, he is also bound by the definition he may see fit to use in the patent. Giving effect to the specification, it is our opinion that "sterilization" as used in the claims is intended to include a step of the process between the time when the water is drawn from the gluten settler

[4] Compare: Roemer v. Neumann (C. C.) 26 F. 102; Libbey v. Mt. Washington Glass Co. (C. C.) 26 F. 757; Electrical Accumulator Co. v. Julien Electric Co. (C. C.) 38 F. 117, 133; Albany Steam Trap Co. v. Worthington (C. C. A.) 79 F. 966; Thompson v. N. T. Bushnell Co. (C. C. A.) 96 F. 238; Bracewell v. Passaic Print Works (C. C.) 107 F. 467; Marconi Wireless Tel. Co. v. De Forest Radio Tel. & Telegraph Co. (C. C. A.) 243 F. 560, 565; Enameled Metals Co. v. Western Conduit Co. (C. C. A.) 269 F. 620; Permutit v. Harvey Laundry Co. (C. C. A.) 279 F. 713; Seiberling v. John E. Thropp's Sons Co. (C. C. A.) 284 F. 746; Rosemary Mfg. Co. v. Halifax Cotton Mills, Inc. (C. C. A.) 288 F. 683; Carson v. American Smelting & Refining Co. (C. C. A.) 4 F. (2d) 463; American Plug Co. v. Hudson Motor Car Co. (D. C.) 19 F.(2d) 609; Bay State Optical Co. v. Klein (D. C.) 20 F.(2d) 915; Van Meter v. Irving Air Chute Co. (D. C.) 27 F.(2d) 170; Michigan Carton Co. v. Sutherland Paper Co. (C. C. A.) 29 F.(2d) 179; Linville v. Milberger (C. C. A.) 34 F.(2d) 386; Metropolitan Device Corp. v. Cleveland Electric Illuminating Co. (C. C. A.) 36 F.(2d) 477; Hudson Motor Car Co. v. American Plug Co. (C. C. A.) 41 F.(2d) 672, 673.

and the time when it is returned to the wet starch house.

Nor may the doctrine of equivalents be invoked to bring the customary sulphurization in the wet starch house within the meaning of "sterilization" as used in the claims. As we have pointed out, the patentee has made his own definition of "sterilization." The two expedients, a momentary heating of the gluten water to 160° Fahrenheit, followed by cooling the same, and the continued maintenance of the customary sulphurization and process temperatures in the system, are not equivalents in function, operation, and result, but serve wholly different purposes and effect wholly different results. An equivalent must be something substituted for the claimed practice—something which is novel in the combination in the sense that the claimed practice is novel in the combination. The sulphurization and process temperatures, as practiced by defendant in the processes alleged to infringe, was the common and necessary practice before the Widmer invention and is equally necessary whether the gluten water is pre-sterilized or not, and in fact is used by plaintiff in its process which employs also the pre-sterilization step of the patent. The teaching of the patent is that the return of the gluten water to the system without pre-sterilization makes the process unworkable. A patentee cannot hold as an infringement a process which the patent states is unworkable and which it is the purpose of the patented invention to improve upon and make workable.

The construction which we think must be placed upon the claims of the Widmer patent in suit disposes of the issue of infringement. The patent is for a series of steps and the evidence, in our opinion, establishes that the defendant does not use one of those, to wit, the sterilization of the gluten water after use and before re-use. Deister Concentrator Co. v. Deister Machine Co. (C. C. A.) 263 F. 706, 712; Silica Products Co. v. Haydite Co. (C. C. A.) 42 F.(2d) 865, 869; Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 25 S. Ct. 697, 49 L. Ed. 1100; Fay v. Cordesman, 109 U. S. 408, 420, 3 S. Ct. 236, 27 L. Ed. 979; Dunbar v. Meyers, 94 U. S. 187, 201, 24 L. Ed. 34.

Other considerations support the construction of the claims which we think must be adopted. We mention some of them: (1) The cancellation of the words "for keeping down fermentation" for the specification as originally filed; (2) the failure of the patent to give any directions as to sulphurization and process temperatures in the wet starch house; (3) the statements of Widmer as to the necessity for pre-sterilization and the effect of the omission of that step; (4) the statement in the German application by plaintiff that pre-sterilization was the characterizing feature of the Widmer invention, and the statements in connection with the British application that sulphurization would serve to prevent slime only in a measure and that special precautions were necessary in returning the gluten water; (5) the fact that the claimed equivalents for the patentee's pre-sterilization by heating were not known to the patentee or to the art at the time the application was filed; (6) the effect of the 1911 "bottling-up" of the Argo plant as a prior public use unless Widmer is limited to the definition of sterilization which we have adopted.

Plaintiff makes a point of the fact that the proceedings in the Patent Office in connection with the Widmer patent were conducted in part by the attorney who represented the patentee in the McCoy patent relied on by defendant. It clearly appears that Widmer's specification was prepared in strict harmony with what Widmer thought he had invented, and that Widmer had the benefit of other legal advice some time before the patent issued. The insinuations of improper conduct by the attorney to Widmer's disadvantage is, in our opinion, wholly unsustained by the facts.

*The McCoy Patent.*—As to this patent of which defendant claims infringement, the issue is validity. The specification states:

"The waste waters, from the gluten settlers and starch filters have been used back in the process to some extent; but in order to use them completely it has been necessary to provide a method of washing the starch whereby the soluble content of the starch, increased as it is by the use of waste waters back in the process, may be accomplished with such a limited amount of fresh water that all of the filtrate or substantially all, may be returned to the system without producing an impractical dilution of the materials under treatment. The present invention provides such a method.

"According to the new process which forms the subject matter of this invention, the starch from the tables is subjected to a double or repeated filtering process, preferably all of the fresh water added to the system being first used in this filtering process. All of the water from the gluten settlers and from the filtering process, is returned to the

system and used for steeping and for the separating operations following the milling operation. The use of this water for the separating operations increases the solubles in the tabled starch, but the double filtering process, wherein fresh water is used, extracts these solubles so that the finished starch is as pure as obtained by former processes. Also, since a greater proportion of solubles is contained in the steep water, which is returned to the steeping process, a greater percentage of the solubles may be recovered by the evaporation of the steep water. Practically all of the water taken from the system is that absorbed by the different materials, or that which is evaporated in the process of recovering the solubles."

Claim 12, which may be taken as typical of the ones here involved (claims 7, 11, 12, 13, and 14), is as follows: "12. In the manufacture of starch by a process which comprises steeping the starch bearing material, comminuting it, separating the starch and gluten from the germ, bran and fibre, tabling the starch and gluten and removing water from the gluten: the improvement which consists in subjecting the starch successively to two filtering and washing operations utilizing the filtrate from said second filtering and washing operation for diluting the starch to be treated in the first filtering and washing operation, returning the water removed from the gluten, in part to the steeping operation and in part to the separating operations, and returning to the separating operations the filtrate from said filtering and washing operations."

The McCoy patent must be construed with the "bottling-up" of defendant's Argo plant in 1911 as a background and in the light of defendant's position with reference thereto as urged in its attack on the Widmer patent. Defendant says: "The 1911 bottling-up is a prior public use anticipating the Widmer claims unless limited to pre-sterilization by heat, being known to the public, in particular to Dr. Widmer and plaintiff, and being a part of the prior art, and not an abandoned experiment; since while the practice was ultimately discontinued, it was completely successful so long as it was used, insofar as the manufacture of starch was concerned, and was discontinued after much use only as a matter of commercial expediency because it gave a product unsuitable for certain, but not all, of defendant's purposes."

And again defendant says: "If the Argo plant had confined its activities to the manufacture of starch to be sold as such, there is no

reason to suppose that the 1911 bottling-up would not have been continued indefinitely. * * * Evidently the Argo management discontinued the 1911 bottling-up process, not because starch could not be made in this way, or even sugar from the starch, but merely because this method of making starch resulted in certain inconveniences in the conversion to sugar."

As to the operation of the Argo plant after 1911 defendant says: "The general practice, however, of returning all the gluten water to the process at Argo was discontinued; and not very long after the 1911 bottling-up, second tables were installed at Argo. * * * In accordance with this process the starch from the first tables is diluted with water and flowed over the second or re-tables. The water from the re-tables was returned in considerable quantities to the wet starch house, entering the hot and warm tanks as shown on the print. * * * This long continued practice at Argo of re-using second table water precludes anyone from obtaining a valid patent on the mere return to the wet starch system of any process water."

The diagram of the Argo bottling-up in 1911 shows that all of the gluten water was returned to the system—in part to the steeping operations and in part to the separating operations. Referring to this diagram defendant says, "It will be seen that the system is a completely bottled-up system."

Washing the starch was old in the art and double filtration of the starch was practiced in defendant's Pekin plant as early as 1921. Accepting defendant's estimate of the bottling-up at Argo (and we think that for the purposes of this counterclaim we are obliged to do so), nothing remains of McCoy's alleged invention, as stated in the claims here involved, except the claim that he was the first actually to apply countercurrent washing the starch. Defendant maintains that the bottling-up at Argo was completely successful so far as the manufacture of starch for certain purposes was concerned and that all that was necessary to make it successful for all purposes was to wash the starch. As the counter-current washing of solids was old, there is no novelty from defendant's own point of view in any of the claims of the McCoy patent relied on here.

The decree of the District Court is reversed, and the case remanded, with directions to enter a decree in accordance with the views herein expressed. Each party will pay one-half of the costs of this appeal.

Affirmed in part, and reversed in part.